### JACOB KUECHLER, COMMISSIONER GENERAL LAND OFFICE, v. GEO. W. WRIGHT.

1. The *alternate* or *even* sections of land reserved for the use of the State by the act of February 4, 1856, incorporating the Memphis, El Paso and Pacific Railroad Company, when surveyed and delineated on the map of the district surveyor, ceased to be public land, and cannot again be regarded as a part of the public domain, so as to subject them to location.
2. Such alternate or even sections were, by Section 3 of Article 10 of the Constitution of 1866, set apart as a part of the perpetual school fund of the State, and thus placed beyond the power of the Legislature to divert them to any other purpose.
3. Section 6 of Article 9 of the present State Constitution also dedicates such alternate sections to school purposes, and no valid location of a land certificate could be made in pursuance of the the act of August 12, 1870, upon such alternate or even sections after they had been designated and surveyed under the railroad laws of the State.
4. Section 5 of Article 10 of the present State Constitution cannot be construed to subject the "reserved sections" to location, but was intended to subject to location the "odd sections" within the reserve of such railroads as had not complied with the terms of their charters.

#### ON MOTION FOR REHEARING.

5. The application for rehearing refused.

6. The action of this court in overruling the application for rehearing is not influenced by any want of jurisdiction in the District Court to grant the writ of *mandamus* to the Commissioner of the General Land Office in a proper case.

7. A *mandamus* will lie to compel the Commissioner of the General Land Office to perform a mere ministerial duty.

APPEAL from Travis. Tried below before the Hon. J. P. Richardson.

On the twenty-eighth of June, 1871, George W. Wright filed in the District Court of Travis county his petition against Jacob Kuechler, Commissioner of the General Land Office. He alleged that he was the owner of a valid land certificate (which he described) originally issued for twelve hundred and eighty acres of land, the certificate for the unlocated balance of which issued on the first of December, 1870, for six hundred and forty acres; that on the twentieth of September, 1870, he caused said certificate for unlocated balance to be filed and entered in the office of the surveyor of Lamar county, by the lawful surveyor thereof, upon fractional sections Nos. 32, 36 and 46, of the Memphis, El Paso and Pacific Railroad Reservation, which he alleged were then subject to location; that by virtue of the certificate, file, and entry, on the —— day of March, 1871, he caused said tracts of land to be surveyed by the surveyor of Lamar county, and on the twenty-ninth of March, 1871, caused said surveys to be duly recorded in the district surveyor's office in Lamar county; that on the fourteenth day of April, 1871, he caused the certificate, with the field notes of survey, to be returned to and filed in the General Land Office; that the certificate, field notes and survey were examined in the General Land Office and found genuine and correct, but that the Commissioner (Kuechler) refused to issue patent, because said survey covered fractional sections Nos. 32, 36 and 46, within what was once and is still claimed as the Memphis, El Paso and Pacific Rail-

road Reservation, which was originally held up from location by any certificate.

Wright alleged in his petition that the reservation referred to, so far as State sections were concerned, was opened to location by the Constitution of the State of 1869–1870, and by the act of August 12, 1870 ; that his surveys were upon land once embraced by State sections in said reserve. He prayed for a peremptory writ of *mandamus* against Kuechler to compel him to issue a patent on his certificate and survey, etc.

On the twenty-third of June, 1871, Kuechler acknowledged service of the petition, waived copy, etc., and in person by way of answer alleged that he had no objection to issuing a patent as desired, "except that the field notes cover fractional sections Nos. ——, in what is known as the 'Memphis, El Paso and Pacific Railroad Reservation,' which fractional sections were originally reserved from location by the law; and whether the law has been so changed as to permit such location is respectfully submitted to the court, under the management of the Attorney-General." He further stated in his answer that "this case is submitted as a test case, in order to furnish a rule for this office."

On the twenty-eighth of June, 1871, Kuechler, by his attorney (Alexander, the Attorney-General), demurred to Wright's petition—

"*First.* Because it did not appear from the petition that the lands reserved were not severed from the mass of the public domain, and dedicated to such special public uses as the State of Texas might choose to make of them, and that they have not remained so severed and dedicated ever since, although the sections reserved for the railroad corporation mentioned in the petition have since been made by the Constitution subject to location.

"*Second.* Because the language of Section 5 of Article 10 of the Constitution of the State clearly indicated that

the public lands severed and dedicated as aforesaid for the benefit of the State, and not for the benefit of railways and railway companies, were not intended to be made subject to location.

"*Third*. Because no statute has been, or can be, constitutionally enacted placing the alternate sections surveyed and reserved on the footing of vacant and undedicated public domain," etc.

Certified copies of the certificate, location, survey, etc., were attached to and made a part of the petition. It was not denied that the railway company, in compliance with the requirements of a supplemental act, had surveyed, sectionized and numbered all the sections and fractional sections of vacant land within their reservation, from the eastern boundary of the State to the Brazos river, within four years after the first of March, 1856, and had deposited a correct map of the work in the General Land Office, and that fractional sections 32, 36 and 46 were included in the reservation.

The transcript contains no statement of facts.

On the fifth of July, 1871, the court below, a jury being waived, rendered a judgment directing the clerk to issue a peremptory *mandamus* to compel the issuance of patent by the Commissioner of the General Land Office. From this judgment Kuechler appealed, and assigned for error—

"1. The court erred in overruling the demurrers filed in said cause by the defendants.

"2. The court erred in the assignment of the reasons for overruling said demurrers."

The 15th Section of the act incorporating the Memphis, El Paso and Pacific Railroad Company, which exempted from location the vacant public land within eight miles on each side of the extension line of the road, from and after the time when the line should be designated by survey, as well as the 16th and 18th Sections of the same act,

which reserved the *even* sections to the State, are sufficiently set forth in the opinion of Evans, P. J.

The 5th Section of the "Act to regulate the disposal of the public lands of the State of Texas," approved August 12, 1870, is as follows:

"The holder of any genuine land certificate or other valid claim against the State of Texas shall hereafter have the right to locate the same upon any part of the public domain of the State not subject to the claim of actual occupants, as prescribed in the foregoing sections of this act, and in accordance with the laws now in force in reference to the locating, surveying and patenting of lands in this State ; *provided*, that all such certificates shall be located, surveyed and returned to the General Land Office by the first day of January, 1875, or be forever barred."

Section 3 of Article 10 of the Constitution of 1866 provides that "all the alternate sections of land reserved by the State, out of grants heretofore made to railroad companies or other corporations whatever, for internal improvements, or for the development of the wealth and resources of the State, shall be set apart as a part of the perpetual school fund of the State."

Section 6 of Article 9 of the present Constitution, among other things, provides, "as a basis for the establishment and endowment of said public free schools, all the funds, lands and other property heretofore set apart and appropriated, or that may hereafter be set apart and appropriated, for the support and maintenance of public schools, shall constitute the public school fund; * * * and no law shall ever be made appropriating such fund for any other purpose whatever."

Article 10, Section 5, of the Constitution of 1870, provides that "all public lands heretofore reserved for the benefit of railroads or railway companies shall hereafter be subject to location and survey by any genuine land certificates."

*Wm. Alexander, Attorney-General,* for appellant.

*James C. Walker and Bonner & Bonner,* for appellee.

EVANS, P. J.—This is a suit by *mandamus* to compel the Commissioner of the General Land Office to issue patents to the appellee, George W. Wright, to fractional sections Nos. 32, 36 and 46, in what is known as the Memphis, El Paso and Pacific Reservation.

The act to incorporate the Memphis, El Paso and Pacific Railroad, passed February 4, 1856, provides, in Section 15, that all the vacant public land within *eight miles* on each side of the extension line of said road shall be exempt from location or entry, from and after the time when such line shall be designated by survey, recognition, or otherwise; the lands hereby reserved "shall be surveyed by said company at their expense, and the *alternate or even sections* reserved for the use of the State; and it shall be the duty of said company to furnish the district surveyor of said district through which said road may run with a map of the track of said road, together with such *field notes* as may be necessary to the proper understanding and designation of the same."

Sections 16 and 18 provide "for the issuance of certificates to be located upon the odd sections within the reservation; *provided,* sufficient quantity of land of said odd sections is to be found therein, otherwise upon any vacant and unappropriated lands of the State; *and provided always,* that the even sections shall be reserved exclusively for the State."

It is admitted by the pleadings that said company, in compliance with Section 4 of supplemental act, surveyed, sectionized and numbered all the sections and fractional sections of vacant land within their reservation, from the eastern boundary of the State westward to the Brazos river, within four years from and after the *first* of

March, 1856, and also in said time deposited a correct map of the said work in the General Land Office; and that fractional sections Nos. 32, 36 and 46, which are the subject of this litigation, were included in the said reservation, and were returned upon the maps as part of the said surveys.

The alternate or even sections when surveyed and delienated by the map lose the character of public land, and cannot regain that character "except by direct and express terms." (State v. Delesdenier, 7 Texas, 108.)

In the case of Wilcox v. Jackson, 13 Peters R., 498, it is said that an appropriation of land by the government is nothing more nor less than setting it apart for some particular use, and whenever a tract of land shall have once been legally appropriated to any purpose, from that moment the land thus appropriated becomes severed from the mass of public domain, and no subsequent law, proclamation, or sale would be construed to embrace it or to operate upon it, although no other reservation were made of it.

Were there any doubt as to the effect of the language of the act appropriating the alternate sections to the use of the State, that doubt would be removed by Article 10 of the Constitution of 1866, which provides, in Section 3, "that all the alternate sections of land reserved by the State out of grant heretofore made or that may hereafter be made to *railroad companies* or other corporations of any nature whatever, for internal improvements, or for the development of the wealth or resources of the State, shall be set apart as a part of the perpetual school fund of the State."

This language is broad and comprehensive. The alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroad companies are dedicated to school purposes and

placed beyond the power of the Legislature to divert them for any other purpose.

We do not stop to inquire the precise place the Constitution of 1866 occupies in our political history; suffice it to say that it is recognized for many purposes as the Constitution of the State until superseded by the Constitution of 1869.

Section 6 of Article 9 of our present Constitution provides that "all the funds, lands and other property heretofore set apart and appropriated, or that may hereafter be set apart and appropriated, for the support and maintenance of public schools, shall constitute the public school fund,  *    *    *    *    and no law shall ever be made appropriating such funds for any other use or purpose whatever." The act, therefore, of August 12, 1870, to regulate the disposal of the public lands of the State of Texas, does not authorize a homestead settlement or the location of a land certificate on the alternate or even sections when once designated and surveyed under the railroad laws of the State.

Section 5, Article 10, of the Constitution does not either in terms subject the reserved sections to location and survey by any genuine land certificate; the plain import and meaning of this section was intended to open the odd sections within the reserve of such railroads as have not complied with the terms of their charters.

To construe this section so as to open the State sections to location would not only do violence to the language, but to the spirit and policy of the Constitution itself. Therefore the judgment of the court below is reversed and the case dismissed.

REVERSED AND DISMISSED.

Opinion delivered August 20, 1872.

ON MOTION FOR REHEARING.

*Wm. Alexander*, *Attorney-General*, for appellant.

*Jas. C. Walker*, for appellee.

McADOO, J.—We see no reason to change the opinion of this court in this case.

The opinion of the Presiding Justice (Evans) rendered on the original hearing we think is clearly based on the law of the case.

Whatever may be the status of the railroad sections in the event of their forfeiture, it is clear that the State sections were dedicated, under the Constitution of 1869, as well as under that of 1866, to the perpetual school fund, and not in any manner subject to entry and location, either under the homestead law or under any class of certificates. The inhibition is complete, and the Legislature has no power to open these lands to any class of land claims against the State.

The former judgment and opinion of the court are adhered to.

REHEARING REFUSED.

Opinion delivered October 21, 1873.


ON SECOND MOTION FOR REHEARING.

*J. C. Walker, Sayles & Bassett, Walton & Green* and *Peeler & Fisher*, for appellee on motion to rehear.

*Geo. Clark*, *Attorney - General*, filed an able brief for appellant, in which he contended—

I.   That a second motion for rehearing is a novelty in our practice, and should not be entertained.

II.   That the lands in question lost the character of " public domain " by the original act of February 4, 1856, and the surveys and delineations thereunder, and no express legislative enactment has restored to them their original character. (State v. Delesdenier, 7 Texas, 108 ; General Laws, 1870, Chapter 53.)

III.   That having been segregated from the mass of "public domain" by the original act of February 4, 1856, and reserved for the use of the State, the people in their organic capacity have *dedicated* them to a particular public use, and the actual intent of the Legislature in the passage of the act of August 12, 1870, is immaterial. (Constitution, 1866, Art. 10, Sec. 3 ; Constitution, 1869, Art. 9, Sec. 6.)

IV.   That the Constitution of 1866, though superseded, is not annulled in this respect by its successor, but its provision as to reserved sections is revived and continued and in no manner qualified by Article 10, Section 5, Constitution of 1869.  " The lands heretofore reserved for the benefit of railroads or railway companies," in the last named sections, means just what it says, and cannot be extended by implication to lands reserved for the benefit of the State.   And the views entertained and expressed by individual members of the convention cannot control or qualify the plain import of the language employed, for a constitution is the work of the people who adopt it, and not of the delegates who frame it. (Dorman v. The State, 34 Ala., 216; Gibbons v. Ogden, 9. Wheat., 188 ;  Potter's Dwarris, 675–676 ;  Story on Cons., Sec. 451.)   Says the eminent author in the section last quoted : "Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or

for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of life, adapted to common wants, designed for common use, and fitted for common understanding. The people make them, the people adopt them, the people must be supposed to read them with the help of common sense, and cannot be presumed to admit in them any recondite meaning, or any extraordinary gloss.''

V. That the Constitution of 1866, and the government founded thereon, were not void, and executed acts thereunder will not be disturbed. (40 Ala., 451; 41 Ala., 423; 43 Ala., 340, 459.)

VI. That if the Constitution of 1866 was a nullity, these reserved sections had before been appropriated by valid legislation to the same use. (General Laws, 1858, Chap. 127, Sec. 11; General Laws, 1866, Chap. 143.)

MOORE, ASSOCIATE JUSTICE. — The judgment of the District Court in this case was reversed and the cause dismissed by this court on the twenty-first of October, 1872, upon the ground, as appears by the opinion of the court then delivered, that the lands designated as the State sections in what is known as the Memphis, El Paso and Pacific Railway Reservation, were not open to location and patent at the date of appellee's location thereon, in September, 1870.

On the application of appellee a rehearing was granted October 21, 1872, and on the fifteenth of April, 1873, the case was again submitted to the court, and on the twenty-first of October, 1873, the court, on the same grounds maintained in its former opinion, again rendered judgment reversing the judgment of the District Court and dismissing the case.

On the twenty-eighth of November, 1873, appellee

Opinion of the Court on motion for rehearing.

made an application for a rehearing upon this second judgment of the court, which application, by a special order, was continued to the present term, and on March 20, 1874, after able and elaborate oral as well as written arguments of the questions discussed in the former opinions of the court- theretofore rendered, it was submitted to our consideration.

We have endeavored to give that thorough examination of the record and patient and careful attention to the argument and authorities which have been submitted to our consideration we felt was demanded before our final determination should be reached, not only by the unusual action of our predecessors in the special consideration shown to a second application for a rehearing, but also from the important as well as peculiar and delicate character of the questions presented for judicial determination, the magnitude of the interest indirectly as well as directly involved, and the great ability, zeal, and learning which have been displayed by counsel in its presentation. After doing this, we have reached the same conclusion to which our predecessors came, and are constrained to say that in our opinion, as in theirs, the judgment of the District Court should be reversed and the case dismissed.

The refusal of an application for rehearing would ordinarily suffice for the final disposition of the cause, without a presentation of the reasons of the court for its approval of the judgment previously rendered. And some members of the court believe that it is unnecessary that we should do more than this in the present instance. In this conclusion, however, I am unable to concur.

Since this case was submitted to us, a question has been discussed and decided in another cause (Bledsoe, Comptroller, v. The International Railroad Company) by a majority of the court, as organized for the decision of that case, which also presents itself at the threshold of the proper determination and disposition of this one.

The result of the decision of the court in that case, if correct, and such as should be adhered to and followed, authorizes the judgment which should be rendered in this case; and unless the grounds of our decision are indicated, it will be left to inference and conjecture whether we have refused to grant the rehearing because in our opinion our predecessors have reached a correct conclusion in a case in which they had jurisdiction, or because we hold their judgment dismissing the case correct for want of jurisdiction of the District or Supreme Court to entertain an application for, or to grant, a *mandamus* to the Commissioner of the General Land Office. The latter certainly might be, and I think would most probably be, the conclusion drawn from the judgment, if no opinion indicating the ground upon which it is rendered should be expressed. If this is not intended to be the import of our action in this case, it should not be left in doubt. Although the court on an application for a rehearing may approve the judgment, if it does not believe the law of the case has been correctly announced in the opinion delivered all must admit it should be corrected; otherwise it would be a snare to entrap litigants as well as inferior courts in other cases. And surely if the entire opinion of the court is extra-judicial, as in a case over which the court has no jurisdiction, and therefore has no authority to decide the questions which it undertakes to discuss, the fact that we may concur in the correctness of the views which it has expressed as abstract questions would not justify us in letting them stand as judicial determinations with the additional weight of our seeming approval.

My former connection with the case of Bledsoe v. The International Railroad Company would induce me to decline a discussion of the questions decided in it, if I could satisfy myself that it was compatible with my duty as a member of the court to do so. With the determina-

tion of that case, my interest in, and connection with the parties to, and the matters involved in, that litigation ended. But with the legal propositions announced in it, when they may arise, or are applicable in other cases in which it is my duty to act, I must deal as with a former opinion of the court in any other case. No judge can long continue a member of this court without having to consider and decide questions with which he may have had a previous professional connection. But when a case is presented which calls for, and when in his judgment public as well as private interest demands, an expression of his opinion, in my view of duty he has no right to withhold it from his mere personal repugnance to discuss a question with which he may have been recently connected as counsel, or through fear that his opinion as a judge may be imputed to the bias of the former advocate.

As applications for *mandamus* against the Commissioner of the General Land Office can only be brought in the District Court of Travis county, as heretofore held by this court (Bledsoe, Comptroller, v. International Railroad Co., *ante*, 537), from which causes are returnable to this branch of the court, unless the question is decided before our adjournment on Friday next the jurisdictional right of the District Court to award a peremptory *mandamus* to this officer, it may be inferred, will not come before this court until its next session at the capital, beginning in April next, during which time the administration of the office may be greatly embarrassed, and many private rights may be abandoned or lost, from the doubt and uncertainty as to whether the aid and authority of the court can be invoked for their protection and maintenance, or through the conviction that it has been determined by this court that in every matter requiring official action there is no appeal from the determination of the Commissioner, however evidently this may be the result

of "whim, caprice, or mistake." And the Commissioner, in whatever doubt he may be as to the proper discharge of his duty, and however anxiously he may desire the judgment of the court as a guide in the performance of the duty imposed upon him, must act on his uninformed judgment, or the advisory opinion of the Attorney-General. If such is the law, I think it should be clearly and distinctly announced. If it is not, any doubt regarding it which may have arisen from anything heretofore said by the court should be removed on the first occasion when it may properly be done.

That the court had jurisdiction to award a *mandamus* to the Commissioner of the General Land Office, when the act in question is such as may be enforced by this writ under the long and well established rules of law applicable to a proceeding of this kind, was generally regarded as clearly recognized and as thoroughly settled by an unbroken current of decisions of this court from its organization down to the recent decision of the court in the case of Bledsoe, Comptroller, v. The International Railroad Company, as any question which has heretofore called for judicial determination. That it may be sure whether a different rule has not been announced in the opinion of the court in that case, it is necessary to analyze and consider some of the propositions of law laid down in it, and the arguments and authorities relied upon to support and maintain them. In doing this I shall endeavor to confine myself to that part of the opinion which treats of the jurisdictional right of the court to award a peremptory *mandamus* to any of the class of officers to which the Commissioner of the General Land Office belongs. With regard to the decision of the court on the case before it, I have nothing whatever to do.

On looking to the opinion for the purpose for which I am considering it, the following propositions seem to me to be clearly and distinctly laid down as general legal

propositions which, if sound, are as applicable to this case as to the one then before the court, viz.:

1. "It is considered that the District Court has not the power and authority under the Consitution to compel an officer of the executive department of the government to perform an official duty."

2. "The question (*i. e.* in respect to the proposition just stated) may be said to have been authoritatively settled in this State under the Constitution of 1845, in the case of the Houston Tap and Brazoria Railroad Company v. Randolph." (24 Texas, 335.)

3. "Under the old Constitution the supreme executive power was vested in the chief magistrate; under the present Constitution it is vested in the entire body of magistracy composing the executive department, with the powers of each separately defined."

It does not appear to have been the purpose of the court to distinctly insist that the jurisdictional power of the court to award a peremptory writ of *mandamus* has been withheld from the District Court by the enumeration in the present Constitution of the officers of which the executive department shall consist. This seems rather suggested as presenting an additional argument in support of the correctness of the conclusion drawn from the division of the powers of the government into three distinct departments, announced as the pivot point of the branch of the case then being discussed, and which, as is claimed, has been authoritatively determined by the court prior to the change in the phraseology of our organic law. That this change may also authorize the same conclusion claimed from the division of the powers of the government seems to be vaguely hinted, it is true, in a subsequent paragraph of the opinion, where it is said, "In the different States of the Union the executive power" (the chief or supreme executive power I presume is meant) "is vested in the Governor, while in this State it

is vested in the magistracy comprising the executive de-
partment," and by the citation in this immediate connec-
tion of the following cases, to-wit: Demmitt, Pet:, 32
Maine, 508; Manion v. Smith, 8 Rhode Island, 192; State
v. The Governor, 1 Dutcher, N. J., 331; Law v. Towns,
8 Georgia, 360; Hawkins v. The Governor, 1 Arkansas,
57; in which, as well as in a few others which might be
cited, it has been held in some of them that the court can-
not, and in others that it will not, award a peremptory
*mandamus* against the Governor.

The inference which seems to be suggested is, if a *man-
damus* does not go against the Governor because the
chief or supreme executive power is vested in him,
neither should it as to other officers who are invested in
direct terms by the Coustitution with a part of the execu-
tive power. But why, I would ask, does this mere change
in the phraseology of the Constitution have this effect?
It does not mark with any more distinctness the separa-
tion of the powers of the government into three depart-
ments. These officers, of whom it is declared the execu-
tive department shall consist, were as unquestionably ex-
ecutive officers and belonged to the executive department
before this change was made in the organic law as since.
Their powers and functions were precisely the same then
as they are now. The difference seems more a matter of
style than anything else, unless it was intended, as is
probable, to indicate thereby more plainly their independ-
ence of the Governor in the discharge of such executive
duties as were respectively intrusted to them. Whatever
may have been its purpose, surely it cannot warrant so
fundamental a change in the structure of the government,
the power and duty of the courts, and the rights of the
citizen, as to justify the conclusion if *mandamus* could
be awarded against these officers under one form of Consti-
tution it could not be under the other. It must be borne
in mind the point of discussion is not whether a *manda-*

*mus* may be awarded to one of these officers because of the nature or character of the particular act or duty in question, to enforce the performance of which the writ is asked; but it is, has the court jurisdictional power to award the writ against any officer belonging to the executive department, in respect to any official act or duty whatever, however clearly clerical or ministerial it may be, the performance of which has been positively enjoined by law.

Although it is not very distinctly presented or strongly urged in the opinion of the court, still, as great weight seems to be attached by the advocates of this theory as to the effect of the division of the powers of the government into three departments, to the fact that it is.held in the cases cited above that a *mandamus* cannot or should not be awarded against the Governor, it may not be amiss to say that it is by no means certain that the weight of authority is against the power of the court to award the writ where the character or nature of the official duty is such as may properly be enforced by *mandamus*. Many of the ablest courts of the country, if not a majority of them, have approved and virtuated the proposition so emphatically announced by Chief Justice Marshall, viz., "It is not by the office of the person to whom the writ is directed, *but the nature of the thing to be done*, that the propriety or impropriety of issuing a *mandamus* is to be determined."

After a careful examination of the authority of the court on an application for the writ against the Governor, the Supreme Court of Ohio declares: "However, therefore, the Governor in the exercise of the supreme executive power of the State may, from the inherent nature of the authority in regard to many of his duties, have a discretion which places him beyond the control of the judicial powers, yet in regard to merely ministerial duty enjoined on him by statute, which might have been de-

volved on another officer of the State, and affecting any specific private right, he may be made amenable to the compulsory process of this court by *mandamus*." (State v. Governor, 5 Ohio St. R., 528.)

And says the Supreme Court of Alabama: "The doctrine that *mandamus* will lie against one of the executive officers of the government, to enforce the performance of a mere ministerial act, was distinctly affirmed in Kendall v. The United States, 13 Peters, 524, 595, 610, 626, 241. In that case Mr. Butler, the Attorney-General, admitted in his argument that "as the ordinary character of an officer's functions would not always determine the true character of a particular duty imposed by law, if an executive officer, the head of a department, even the President himself, were required by law to perform an act merely ministerial and necessary to the completion or enjoyment of the rights of individuals, he should be regarded *quoad hoc*, not as an executive, but as a merely ministerial officer, and therefore liable to be directed and compelled to the performance of the act by *mandamus* if Congress saw fit to confer the jurisdiction." (12 Peters, 595.)

"The same principle applies to the judicial officers who, though not answerable for errors of judgment, however plain the mistake, are responsible for any injury which results from their failure to perform a ministerial duty cast upon them by law. In Furguson v. Earl of Kinnard, 9 Clark & Fin., 279, 290, Lord Brougham, after stating the first branch of this proposition, added: "But where the law neither confers judicial power nor any discretion at all, but requires certain things to be done, everybody, whatever be its name, and whatever other functions of a judicial or discretionary nature it may have, is bound to obey, and with the exception of the Legislature and its branches everybody is liable for the consequences of disobedience." Lord Campbell said in

the same case (p. 312): "When there is a ministerial act to be done by the persons who, on other occasions, act judicially, the refusal to do the ministerial act is equally actionable as if no judicial functions were, on any occasion, entrusted to them. There seems no reason why the refusal to do a ministerial act by a person who has certain judicial functions should not subject him to an action in the same manner as he is liable to an action for an act beyond his jurisdiction." (See also opinions of Lord Lyndhurst and Lord Cottinham, pp. 280, 306.)

All this is but the result of the just and wholesome principle that no public functionary, whatever his official rank, is above the law, or will be permitted to violate its express command with impunity. While, therefore, it is true that in regard to many of the duties which belong to his office the Governor has, from the very nature of the authority, a discretion which the courts cannot control, yet in reference to mere ministerial duties imposed upon him by statute, which might have been devolved on another officer if the Legislature had seen fit, and on the performance of which some specific private right depends, he may be made amenable to the compulsory process of the proper court by *mandamus*. (Tennessee and Coosa Railroad Company v. Moore, 36 Ala., 371.)

In Harpending v. Haight, 39 Cal., 189, Wallace, J., says: "And it is settled by the uniform adjudications of this court that in such a case the writ will be issued against the Governor of the State to enforce the performance of the act required." (McCauley v. Brooks, 16 Cal., 11; Middleton v. Low, 30 Cal., 596; Stewart v. Haight, January term, 1874.) These authorities are supported by numerous cases adjudicated in other courts. And says Crockett, J., in the same case: "Any other rule than this would be subversive of private rights, and incompatible with the fundamental principle of republican government, to-wit, that all public officers can be compelled by

law to perform merely ministerial acts and duties involving the exercise of no discretion." (See also Pacific Railroad v. Governor, 23 Mo., 353; Colten v. Ellis, 7 Law Reports, N. C., 545; Malpras v. Caldwell, N. C., January term, 1874; Magruder v. Swan, 25 Md., 172; Chamberlin v. Sibley, 4 Min., 309; The State v. Maffit, 5 Ham., Ohio, 358; Commonwealth v. Dennison, Governor, 24 How., 66.)

After a careful examination of the conflicting decisions of different courts on the question, a late commentator on the law of *mandamus* says : "But the better doctrine seems to be, that the Governor is not an exception to the general rule that all public officers may by *mandamus* be compelled to perform an act clearly defined and enjoined by the law, and which is merely ministerial in its nature, and neither involves any discretion nor leaves any alternative." (Moses on *Mandamus*, 82.)

An examination of the cases in which it has been decided that the writ will not issue to the Governor shows that it is so held on grounds not applicable to any other officer of the executive department. This is plainly evident from the fact that in all the States in which these decisions have been made it is well established that *mandamus* will lie to compel the heads of executive departments to perform mere ministerial duty.

Thus says the Supreme Court of Arkansas, in Hawkins v. The Governor, 1 Arkansas, 587, the case cited to show that the writ cannot issue to the Governor: "All the officers of the government except the President of the United States and the executives of the States are liable to have their acts examined into by a court of justice." And says the same court, in Black v. The Auditor of the State, 16 Ark., 238: "It is a well settled principle that *mandamus* will lie against the heads of departments of the Federal and State Governments to compel them to perform a mere ministerial act imposed upon them by

law, though not in those acts requiring the exercise of judgment and discretion." (See also Danley v. Whitely, 14 Ark., 687; Heampstead v. Underhill, 20 Ark., 337; Western v. Dane, 51 Maine, 461; People v. Adam, Auditor, 3 Mich., 427; Bay City v. The State Treasurer, 23 Mich., 500.) In the last of these cases a *mandamus* was awarded to enforce performance of a duty resulting from a decision of the court holding a statute to be unconstitutional. (People v. Auditor, 17 Mich., 161; People v. Burridge, 38 Ill., 307; People v. Minor, Auditor, 46 Ill., 384; People v. Smith, 43 Ill., 219; People v. Secretary of State, 58 Ill., 90.)

The ground upon which its decision is made is thus declared by the Supreme Court of Georgia, in the case of Law v. Towns, Governor, 8 Georgia, 360: "But while we are unable to give a satisfactory *legal* reason why the remedy should be denied to the citizen, yet we are satisfied that for political reasons alone the remedy by *mandamus* ought not to be enforced against the chief executive officer of the State." And in the subsequent case of The State v. Powers, 14 Georgia, 338, the court says: "In every well constituted government the highest judicial authority must necessarily have a supervising power over all inferior or subordinate tribunals, magistrates and all others exercising public authority. If they commit errors, it will correct them. If they refuse to perform their duty, it will compel them—in the former case by writ of error, in the latter by *mandamus*."

In the Constitution of each of these States, as indeed is the case in that of almost every State in the Union, there is the same division of the powers of government as in our Constitution. And in nearly all of them the chief or supreme executive power is vested in the Governor, without naming in specific terms the other officers of the executive department. But in all of them, it is believed, the officers usually spoken of as officers of the executive de-

partment are created, and their functions mainly defined. The Constitution of Ohio is the only one which has come under my observation in which the same enumerated officers of which the executive department shall consist is expressly declared, as is done in the present Constitution of this State. The Constitution of Indiana, however, though not in the precise terms as ours, is clearly the same in effect. In it heads of departments are denominated administrative officers. But in the division of the powers of government into three departments it is declared that the executive department includes the administrative. In both of these States *mandamus* will lie to these officers. (Dodd v. Miller, 14 Ind., 433 ; Smith v. Talbot, Auditor, 11 Ind., 144.) And in Beal v. Ray, 17 Ind., 554, it seems to be intimated that it will lie against the Governor. And so it is held in Ohio, as has been already shown. (State v. Governor, *supra.*)

But if it is insisted that the specification in the Constitution of the different officers of whom the executive department shall consist, why may it not be held in favor of the greater liberty and better protection of the rights of the citizen, that the Governor, if not previously so, has been placed upon the same footing with other executive officers, and is thereby subject to the process of the court in matters of mere ministerial duty affecting private rights, which involve neither judgment nor discretion, rather than to conclude that the other officers named are taken by it from under the control and restraining power of the judiciary, in discharge of official duties of this character, if aforetimes they were subject to it.

I will next consider whether it has been authoritatively decided by this court that the District Court has not the power and authority, under the Constitution of 1845, to compel an officer of the executive department to perform an official duty.

The only authority relied on to maintain this proposi-

tion is the case of the Houston Tap and Brazoria Railroad Company v. Randolph, 24 Texas, 335. That it may appear that this was the ground upon which that case was decided, an extract is made from the opinion delivered by the present Chief Justice, which I readily confess appears to show that he then entertained the same views on this question as are now expressed in the case upon which I am commenting. But if I have not misapprehended the position of the Chief Justice in regard to the matter, he does not hold that that case was decided by the court upon the ground indicated in this extract from his opinion, but concedes that the writ was refused because it appeared, as is clearly shown in the opinion, that the act in question involved executive judgment and discretion, and was not merely ministerial, even if it had satisfactorily appeared from the petition that the relator was entitled to anything under the law upon which the proceeding was based. It is well known that Judge Bell, who was then an associate justice of this court, maintains that the grounds just suggested were those upon which the case was decided. And certainly no one who has examined the reports of this court from its organization to the time when that case was decided can hesitate to say that Judge Wheeler, the Chief Justice and remaining member of the court, could not have concurred in a judgment denying to the court jurisdictional authority to award a writ of *mandamus* to the heads of the executive departments in respect to mere ministerial duty.

But if he may not look to these extraneous sources to ascertain the grounds upon which the judgment of the court was rendered, the opinion itself, it seems to me, does not leave it a matter of doubt. The merits of the question presented by the record are elaborately discussed and fully and clearly disposed of and decided. The additional or individual views of the judge delivering the opinion are brought forward and presented as tending to

support the conclusion otherwise reached. If, however, the court had no jurisdiction, and it was then as scrupulous as it was in the case of Bledsoe v. The International Railroad Company—and we have no reason to conclude that it was not—it would not have felt at liberty to consider the case on its merits.

I also insist that the decision of the court should not be held to have been made upon the ground indicated in the extract from the opinion to which I have referred, because a decision of this point was not necessary for the disposal of the case, and it is not the custom of the court to finally decide important constitutional questions when not required to do so, and especially when they have not been discussed by counsel, but are suggested by the court in its opinion. Such a construction of this decision would in effect overrule a number of former decisions, yet there is no intimation in the opinion that such was its intention. It has not heretofore been held to have decided this question. But if it does decide it, it is in effect overruled by subsequent decisions of the court, wherein the jurisdictional authority, which it is now claimed was denied, has been assumed and exercised, and wherein the prior decisions supporting the authority are relied upon and recognized as still in force, and wherein the views expressed in this case, and which are now claimed to be an authoritative decision of the question, are evidently repudiated and denied. (Durnett v. Crosby, 28 Texas, 182; Tabor v. Commissioner, etc., 29 Texas, 508; Railroad Company v. Commissioner, etc., 36 Texas, 382.)

If I am correct in these views, however great may be the respect to which the legal opinion of the learned judge by whom the proposition was first suggested in this court is entitled, or whatever consideration may be due to the force of reasoning with which he has maintained it, or weight of authority from other sources by which he may have sustained it, still it cannot be said that it has

been authoritatively decided by this court, as claimed in the opinion on which I am adverting. And if this proposition, now for the first time decided by this, or, as I think, any court whatever, can be maintained, it must be upon some other authority than the former decisions of this court. It must, indeed, be done by authority of sufficient weight to overturn its settled course of decision and its well established practice from its organization down to the past few weeks.

A few of the former decisions of this court, in which this jurisdiction has been recognized, and in some instances exercised, are cited, and though their authority is not directly denied, they are commented upon, as it seems to me, as if for the purpose of weakening their force. A petition for a *mandamus*, it is said, has never been sustained in this State against the Governor, Secretary of State, Comptroller, Treasurer, or Auditorial Board, though many have been filed and prosecuted ; and out of the numerous cases against the Commissioner of the General Land Office, in a very few only has the judgment of the court gone against him. The first of the cases cited was, it is suggested, between two claimants, and the writ was incidental ; in the second there was no statement of facts, and in neither was the jurisdictional right to the writ argued by counsel or discussed by the court. The principles announced in the subsequent decisions assume to be drawn mainly from these two cases, and the decisions of the Supreme Court of the United States upon the subject, which, however, seems to be thought not to warrant them.

In response to these suggestions I must, with all due deference, say, that I see nothing in this examination, as it is called, into the origin and history of the cases referred to, the pith of which I have endeavored to sum up above, which tends to deny the jurisdictional power of the court to award the writ to the heads of the executive

departments, or to detract from the authority of the former decisions of the court on this subject. That only a few of the cases against the Commissioner, and none of the many prosecuted against the other executive officers, have been sustained, exemplifies the efficiency and faithfulness of these officers in the discharge of their official functions, and especially in the performance of such ministerial duties as they have been required to perform. The decisions also aid us in discriminating between executive acts, which as a general rule are committed to the judgment and discretion of the officer to whom they pertain, and those which are merely ministerial, in respect to which he has neither by the character of his office nor the terms of the law imposing the particular duty official judgment or discretion. Indeed, these numerous cases, and the long and uniform course of judicial action, in the course of which neither counsel have suggested nor the court intimated a doubt as to its jurisdictional authority to award a *mandamus* against any of these officers in respect to ministerial duties, should be held at this late day as conclusively settling the question. The power or jurisdiction of the court to award the writ was at the threshold of every case. And unless there was jurisdiction "to compel an officer of the executive department of the government to perform an official duty," the discussion or consideration of the character of the particular duty in question was unnecessary, and, as the court now says, extra-judicial and without authority. Nor does it matter that there may be conflicting interest involved in respect to the ministerial duty the performance of which is sought to be enforced. In such cases it appears to be in accordance with precedent and principle to make those claiming an interest parties to the proceeding. (The Queen v. Powell, etc.; The Queen v. Evan, etc., 1 A. & E., 554.) Nor can the want of a statement of facts detract from the authority of the other case on the question of

jurisdiction. This fact, it seems to me, must have presented the question of jurisdiction more directly and prominently to the attention of the court. And had it been a matter about which there could be a doubt, it can hardly be supposed it would not have been noticed by the eminent judges then composing the court. Nor should it, I submit, lessen the weight to be attached in this court to the unbroken current of its former decisions if it should be found that a somewhat broader scope has been given to the writ of *mandamus* by these cases than has been done by the Supreme Court of the United States. I do not concede, however, that there is any such difference. I cannot protract this opinion by the comparison; but while, no doubt, excerpts may be selected from different opinions of the two courts which would present an apparent difference in their rulings in some instances, I am fully satisfied, where the facts in each case are considered, and these excerpts are read and construed in the light of these facts, it will be found that there is no substantial difference in their ruling on the subject.

But the authority of the court to issue a *mandamus* to officers of the executive department does not rest alone upon the practice and usage of the court as shown in the numerous cases in which it has been applied for, and in which the court has acted on such application without doubt as to its authority to grant the writ, from its very organization until it was suggested in the opinion in the case of the Houston Tap and Brazoria Railroad Company v. Randolph, *supra*, and a like continued exercise of jurisdiction without question since then until the present time. The Legislature has expressly conferred the jurisdiction, if it had authority to do so, and it had not been already c. nferred by the Constitution. The 4th Section of the act . organize the District Courts, and to define their power and jurisdiction, passed May 11, 1846, reads: "The judges of the District Courts and each of

them, either in vacation or term time, shall have authority to grant, on petition to them therefor, writs of *habeas corpus*, *mandamus*, injunction, sequestration, error, and *supersedeas*, and all other remedial writs known to the law, returnable," etc. (Paschal's Digest, Article 1407.) To whom under this full and unlimited grant of authority may the writ go? The authority conferred is without limitation or restriction. Can we say that any particular class of persons or officers are exempted from it any more than from any of the other writs mentioned in connection with it? Certainly not. The grant of authority is as broad and comprehensive as the common law from which we get the writ. It is limited only by the extent to which judicial authority has been restrained by the Constitution and may not be conferred by the Legislature.

But the advocates of the theory which I am endeavoring to combat maintain that the division of the powers of the government by the Constitution requires that the statute granting this general authority shall be so construed as not to include officers of the executive department. If this is the proper and necessary interpretation of the Constitution, their conclusion cannot be controverted, however general may be the language of the statue. But this is certainly not the construction given it by the Legislature. It manifestly intended and supposed the writ might go to these officers, for it further enacts "that all writs of *mandamus* sued out against heads of any of the departments or bureaus of government shall be returnable before the District Court of the county in which the seat of government may be."

The executive department has always heretofore concurred with the judicial and legislative departments in this interpretation of the Constitution and the jurisdictional power of the courts to issue the writ to the heads of the executive departments, touching matters of mere ministerial duty. From the organization of the govern-

ment to the present moment, so far as I am informed, or as can be ascertained by the records of this court, no officer of the executive department has ever denied or controverted the authority of the court to grant the writ, or failed to yield cheerful obedience to it. In this very case, in which the power has been denied by this court, the defendant did not, in the court below, controvert the jurisdiction of the court to award the writ, but placed his defense upon other and entirely distinct grounds. Indeed, in the case of the International Railroad Company v. Bledsoe, on an application to this court for a *mandamus* touching the same matter, decided at the last term, and dismissed for want of original jurisdiction by this court, the ground taken by the Attorney-General and his associate counsel was, that jurisdiction was conferred upon the District Court by the Constitution and the statute to which I have referred.

Now, with respectful deference, I ask, is there anything in the familiar division of the powers of the government into three distinct co-ordinate departments, and the inhibition of the exercise by either one of them of any power properly pertaining to either of the others, which has been thus long overlooked, which requires this court to hold a statute enacted by the Legislature, so often acted upon by the judiciary and acquiesced in by the executive department, to be unconstitutional? A like division of power is a fundamental provision, not only in the Constitution of the United States, but also in the Constitution of probably every State in the Union. Yet such a restraint upon the judicial department (except in a few of the States, where it has been held, upon political considerations, that the writ cannot issue against the Governor) has never received the slightest consideration. And in not one of these States, so far as I have been able to ascertain, has this construction been intended so as to exempt any other executive officer than the Governor from liabil-

ity to the writ. Thus, in the case of The People v. Bagley, Governor, etc., decided by the Supreme Court of Michigan, April term, 1874 (St. Louis Law Journal), in which it is held the writ cannot issue against the Governor, Mr. Justice Cooley says: "In many cases it is unquestionable that the head of an executive department may be required by judicial process to perform a legal duty, while in other cases, in our judgment, the courts would be entirely without jurisdiction; and as regards such an officer, we should consider the nature of the case, and the duty to be performed must determine the right of the court to interfere in each particular instance. Where the head of a department acts as the mere assistant or agent of the executive in the performance of a political or discretionary act, he is no more subject to the control of the courts than the chief executive himself; but where a ministerial act is required to be done by him, independently of the executive, though in a certain sense he is an executive officer, it would be as idle to dispute his responsibility to legal process as it would be to make the same claim to exemption on behalf of an officer entrusted with similar duties of lower grade. This is emphatically the case under the Constitution of this State, which provides for the election of State and inferior officers alike by the people, and makes the chief officers of the State below the Governor as independent of his control in the performance of their duties as are the officers of the counties or of the townships."

And certainly the cases from the Supreme Court of the United States cited to establish the first proposition discussed in the opinion, viz., that the act to be done involved judgment and discretion, so far from supporting the second proposition, that an officer of the executive department cannot be compelled to perform an official act, are directly the other way. Decatur v. Paulding, 14 Peters, 515, draws the distinction between the two classes

of official duty, in one of which the performance of the act in question may be enforced by the writ, in the other it may not. The facts showed the case before the court belonged to the latter class; the writ was therefore refused. While in the preceding case of Kendall v. United States, 12 Peters, 610, in which the like distinction was pointed out, the facts warranting it, the writ was awarded. That the defendant was a member of the cabinet, holding his office at the pleasure of the President, seems from the judgment of the court to have been of no consequence. It should be noted, also, that every objection suggested in the opinion in the Houston Tap and Brazoria Railroad case, and now held to warrant the conclusion that the court has not the jurisdictional power to issue the writ to an officer of the executive department, was most strenuously and ably presented and urged upon the court in the motion of the respondent and by counsel who opposed the grant of the writ, though most of them were either modified or conceded to be erroneous by the distinguished lawyer who then filled the office of Attorney-General. Neither does the case of the United States v. Guthrie (17 Howard, 284) militate against the authority of the court to issue the writ, but on the contrary recognizes and upholds its power to do so in proper cases, although the manner in which the quotation made from Mr. Justice Daniel's opinion, beginning in the middle of a sentence, might suggest a different impression. The case was an application for a *mandamus* to the Secretary of the Treasury to compel the payment of the salary claimed by the relator after he had been removed from office by the President.

The opinion of Judge Daniel from which the quotation is made was concurred in by three other members of the court. In it he says: "Thus it has been ruled that the only acts to which the power of the courts by *mandamus* extends are such as are purely ministerial, and in regard

to which nothing like judgment or discretion in the performance of his duties is left to the officer; but that where the right of judgment or discretion exists in him, it is he, and not the courts, who can regulate its exercise."

Four other judges *concurred in the judgment refusing the writ*, upon the ground that a writ of *mandamus* to the Secretary of the Treasury was not a legal remedy by which to try the title of the relator to the office claimed by him. And until his title had been legally tried and determined, he could take no step to compel the payment of the salary. From which it seems to be inferable, if his title to the office had been legally established, or had not been in question, he might, in their opinion, have compelled payment of the salary by *mandamus*. Thus stands the case with eight of the nine judges then composing the court. The ninth, Mr. Justice McLean, held the applicant was entitled to the office claimed, and that the *mandamus* ought to be awarded.

The jurisdictional power to award the writ in respect to a matter of mere ministerial duty has never been questioned by this court on the ground of the division of the powers of the government between its three distinct and independent departments. The point upon which all the cases have turned has been whether the duty to be performed was ministerial in its character, or was it an executive act requiring the exercise of official judgment and discretion or involved the exercise of official functions in respect to which the court had no right to interfere. (United States v. Seaman, 17 How., 225; Commonwealth of Kentucky v. Dennison, Governor, 24 How., 98; United States v. Commissioner, 5 Wall., 563; Gaines v. Thompson, 7 Wall., 347; Litchfield v. Register, 9 Wall., 575; Commonwealth v. Boutwell, 13 Wall., 526.)

The law upon this subject has never been, and I imagine will never be, more clearly and correctly stated than it is in the opinion of Judge Marshall, in the case of Mar-

bury v. Madison, 1 Cranch, 137. I am aware that it is becoming somewhat common of late years, in some courts, and with some political theorists, to attempt to disparage the authority of this opinion by speaking of it as a mere dictum. Suppose it is, it is from a judge whose dicta carry greater weight of authority with the legal profession than do the judgments of but few courts. If it be a dictum, the chain of reasoning by which its conclusion is reached is wrought with a force of logic in which there is no flaw and from which there is no escape. It has been frequently referred to as of the highest authority in subsequent cases in the same as well as in other courts. It is cited with approval in many of the cases relied upon in the opinion of this court controverting its conclusions, as will be seen by a reference to them. It has been quoted with approval by the most, if not all, of our commentators, and if its authority has been impugned or denied by any I am ignorant of it.

"The government of the United States," says the judge, "has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right." Again: "It follows, then, that the question, whether the legality of an act of a head of a department be examinable in a court of justice or not, must always depend on the nature of the act." And, finally, he says: "The conclusion from this reasoning is, that where the heads of departments are the political or confidential agents of the executive, merely to execute the will of the President, or rather to act in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable. But where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers

himself injured has a right to resort to the laws of his country for a remedy."

But if the court in such case undertake to grant relief and apply a remedy for that which no one can deny to be a wrong, has it passed beyond the constitutional limitation of judicial power, and undertaken to exercise executive functions and duties. If it has, then was this great judge and the court over which he presided in error as to the essential elements of judicial power. It is an error, however, in which they have fallen in common with the courts of England and the sages of the common law from its earliest time, and which has been shared by the courts of all the States of America and the Legislatures of most of them, as is shown by their repeated grants of writs of *mandamus* to executive officers, and the many statutes specifically regulating and defining this writ as a means of enforcing the performance of duty in many cases by these officers, which must be held unconstitutional if to enforce obedience and compel the discharge of such official duty by *mandamus* is the exercise of executive power.

If one of these officers will not obey a plain and direct command laid upon him by law, but refuses to perform the duty required, no one doubts that an injury is done the individual who is thereby deprived of the enjoyment of that to which by law he is entitled. If this is "a government of laws," is there not some remedy for this wrong? If it is not *mandamus*, what is it? These suggested an impeachment, or the election of some one else who will perform the duty required. But certainly neither of these are remedies for the injury done the individual. If an officer acts ignorantly instead of viciously or corruptly, ordinarily he should not be impeached. Should his conduct warrant his impeachment, it is not probable the manner in which he may discharge his mere ministerial duties, in which private individuals are alone di-

rectly interested, will attract sufficient public attention to render such a result practicable. But if he is impeached, this is for the wrong done the public for breach of official duty, and not a redress of an individual injury. (Ethridge v. Hall, 7 Port., 47.) Still less can it be supposed the election of some one else, at the expiration of his official term, is a remedy for the wrong done. This, indeed, is too obvious for comment. It is a fundamental principle that *mandamus* does not lie where there is any other adequate remedy by the ordinary process of the court. But the remedy must be adequate for the relief of the relator. Hence it has always been held the writ will not be refused because the default complained of may subject the defendant to indictment. (10 Ad. & E., 531; 10 Wend., 395; Spencer, 659; 2 B. & A., 644.) Nor is the liability of the officer to an action on his official bond a reason for the refusal of the writ. (State v. Dougherty, 45 Mo., 294.)

Although not directly insisted upon in the opinion of the court, in some of the cases cited and relied upon, some weight seems to be attached to the fact that in England it is held that a *mandamus* cannot, in any case, be granted against the king; nor the servants of the crown, strictly as such, being the depositaries of public money.

The rule as respects public officers, whether of the treasury or others, will, I think, be found, on an examination of the cases, not materially dissimilar from that held by most of the American courts. Thus, in the case of The King v. The Lords Commissioners of the Treasury, 31 Com. L. R., 139, it was decided "that a *mandamus* lay to the Lords of the Treasury to order payment, inasmuch as the claimant had no other remedy, and as the writ was demanded, not against the king, but against officers into whose hands money had been paid under an act of Parliament for the use of an individual." While in the cases of The King v. The Lords Commissioners, Id.,

424; Same v. Same, Id., 427; and Ricketts *ex parte*, Id., 434, the writs were refused because the acts in question involved discretion. In the case of Regina v. The Lords Commissioners of the Treasury, 71 Com. L. R., 357, which came before the Queen's Bench, H. T., 1851, on an application of Lord Brougham as surviving trustee of Queen Adelaide, late Queen-Dowager, to compel the payment of a proportional part of the quarterly sum of £25,000 of her annuity, which would have become payable on the thirty-first of December, 1849, had she survived until that time, Lord Campbell, C. J., said: "The court would not extend the writ of *mandamus* to a case to which it was not applicable merely because the objection was waived. *But we think that if the claim be founded in law, mandamus is the proper remedy.*"

That the writ will not issue to the king is, it is said, because it would be an incongruity in the sovereign commanding itself, and also because obedience could not be enforced. (Tapp. Mand., 161-2.) And because, as may also be added, as to matters of complaint against the king, and as to money in the treasury held in his name, and as a part of the public money in contemplation of law subject to his command, there is another adequate and well recognized remedy, viz., by petition of right. (Queen v. Powell, 41 Com. L. R., 574.) But none of these objections are applicable to writs of *mandamus* to executive officers under our theory of government. The writ with us does not go in the name of any officer, but in that of the State, or people; and until we are prepared to admit that some of our officers are superior to the people from whom they derive their authority, and are not amenable to the law, they should be required to yield obedience to its commands. There is no just ground of objection to the jurisdiction of the court, from the fact that all public officers, like individuals, must look to the judicial department for the proper interpretation and

construction of the law, and when it is judicially an-
nounced they must observe and follow it, or suffer the
penalty if they wantonly disobey it.

Nor can I see any reason to fear that anarchy will re-
sult from the exercise of this power by the court in the
future more than it has in the past.  It is an unwarranted
supposition, I think, to say that the officers of the execu-
tive department would entertain the idea, much less under-
take, to obstruct the due course of the law, or attempt to
thwart or defy the judgments of the courts.  But if such
should be the case, ample provision has been made for
filling the places of such recusant officers and protecting
the country against anarchy or revolution.

It is asked, if the officer obeys the mandate of the
court, and does the act commanded, who performs the
official duty, the officer or the court who commands him?
I answer, unquestionably the officer.  It might with equal
propriety be asked in cases of litigation between private
parties, who performs the matter adjudged, the court or
the party required to do so by its judgment?

While it must be admitted no human government can
be organized which will in all instances secure the citizen
in the complete and perfect enjoyment of all his rights of
person and property, and that there must be an end to
controversy somewhere, whether the result attained is
what it should be or not, yet I cannot see that this is a
reason why the citizen should be deprived of all remedy
touching matters of individual right depending upon the
performance of a mere ministerial duty by one of these
executive officers.  The time-honored maxim that there is
a legal remedy for every wrong, if not true to the letter,
is surely persuasive that an element of judicial power of
so much importance, recognized from time immemorial
by the courts of the country from which our jurispru-
dence is derived and exercised under similar constitu-
tional provisions and restrictions as in ours by the courts

of probably every State in the Union, is not denied to our courts. (Northwestern N. C. R. Co. v. Jenkins, 65 N. C., 173 ; State v. Lawrence, 3 Kan., 95; State v. Secretary of State, 33 Mo., 293; People v. Smith, 43 Ill., 219 ; Hemmerick v. Hunter, 14 La. An., 221 ; State v. Wotnowski, 17 La. An., 156 ; State v. Draper, 48 Mo., 213; Swan v. Buck, 40 Miss., 219 ; Swan v. Work, 24 Miss., 439 ; *Ex parte* Pickett, 24 Ala., 91 ; *Ex parte* Echols, 39 Ala., 698 ; State v. Bordelen, 6 La. An., 68 ; People v. Smith, 48 Ill., 219 ; People v. Secretary of State, 58 Ill., 90 ; Swan, Auditor, v. Josselyn, 14 S. & M., 106 ; Auditor v. Adams, 13 B. Monr., 150 ; Douglass v. Hastings, 11 Wis., 448 ; State Bank v. Hastings, 15 Wis., 75 ; Free Press Association v. Nichols, 45 Vt., 7; Bryan v. Collett, 15 Iowa, 538 ; Auditor v. Hardin, 8 B. Monr., 648.) In the last two of these cases the same objections to the jurisdiction of the court which has been relied upon here were directly presented and lucidly discussed, and decided in favor of the jurisdictional right of the court to award the writ.

To enquire into and determine as to matters of this character, and to prevent the rights of citizens from being " spirited away" at the " whim or caprice" of officers in the discharge of ministerial duty, is plainly, in my opinion, the exercise of the judicial power conferred by the Constitution. The courts of England and America have always claimed and used it as one of their judicial functions. The legislative and executive departments of the different States as well as ours have at all times heretofore recognized and acquiesced in its exercise by the judicial department, even where it has not been regulated and defined by statute, which, however, has been done in a number of States, and in most of them these executive officers are in terms made amenable to the writ, which is clearly unconstitutional if executive and not judicial power is attempted thereby to be conferred upon the courts.

What is the nature or character of the power exercised when a wrong is redressed, or relief granted by writ of *mandamus*, in a case of admitted jurisdiction, to a purely ministerial officer, who is invested with no executive or discretionary functions whatever? Is it executive or judicial? Certainly no one can doubt that it is the latter. In England the writ issues in the king's name, and from his Court of the King's Bench, because he is said to be the fountain and source of justice, and in early times he is supposed to have sat in this court in person to administer justice to his subjects. It is therefore called a prerogative writ. But, whatever speculative deductions as to its original character may be indulged in by antiquarians who seek to trace back to their origin the various writs and forms of judicial proceeding through and by which justice is now administered, this writ has certainly from the earliest days of the common law been recognized and used as a judicial writ of the most extensive remedial nature. (3 Com., 110.) Its use as a judicial writ, it is said, may be traced to the reigns of Edward II. and Edward III. (Ren & Askew, Burr., 2186.) Whether with us it should be called a prerogative writ or not is of no importance. Though as the people here may certainly with as much propriety be regarded as the source and fountain of justice as is the king in England, I cannot see that there is any great incongruity in calling it by this familiar common law appellation. It is, however, a judicial writ, whether it also be called a prerogative one or not, by which the sovereign people grant relief when there is a clear legal right and no other specific adequate remedy. It cannot be controverted that under the constitutional distribution of power between the three departments, the authority to grant relief and administer justice by means of this judicial writ, to the full extent of its common law functions, is directly invested in the judicial department, or if not thereby directly conferred,

it certainly might be conferred by the Legislature, not only to the extent to which the writ has been used at common law, but to the full extent and limit to which judicial power might authorize its use if its common law use fell short of this, unless the authority to do so is clearly withheld or denied by some other provision of the Constitution. That it has been withheld as to executive officers it is claimed is a necessary result from the division of the powers of the government between the three departments. But can it with any propriety be said the grant of all executive power to the executive department is a denial of or withdrawal from the judicial department of any part of the judicial power as clearly and unqualifiedly granted to it as the executive power is to the executive department? Certainly not. The mere character of the officer by whom an act is done, of which complaint is made to the court, surely does not change the nature of the function or power exercised by the courts, and hence it has always been held, as we have heretofore shown, that it is the nature of the act to be performed, and not the character of the officer, which determines the right or duty of the court to award the writ.

It is the function and purpose of the judicial department of the government to expound and determine the law, to redress wrongs occasioned by its violation, and grant relief by enforcing obedience to it; while it is that of the executive department to execute and carry into effect the laws declared and enacted by the legislative department, and expounded and interpreted by the judicial department. And I do not see how it can be said that there is any interference with the proper exercise of the official functions or power of an executive officer more than any other by compelling him to do an act wherein he is entrusted with no executive or official discretion, but which the law positively and directly commands and his

official obligation clearly binds him to perform.   No one
denies that the writ may be awarded to an inferior court.
Discretion in such case cannot be controlled, but action
may be commanded.   The superior court does not thereby
perform the act required to be done by the inferior tri-
bunal, or exercise its function.   It merely, in the dis-
charge of its own duty, enforces obedience to law and the
fulfillment of duty by the inferior tribunal to whom the
writ goes.

But if the exercise of such power by the judicial de-
partment in any way trenches upon the powers of the ex-
ecutive department, as the grant of power in the Consti-
tution to the former is as unqualified as it is to the latter,
all that can be said is that the line of division between
these conflicting grants of power must be ascertained and
fixed where the proper interpretation of the Constitution
places it.   Were this attempted, there would be but little
difficulty, I think, in showing by the well established
canons of construction that the courts do not exceed the
limits of their jurisdictional authority in requiring by
*mandamus* executive officers to perform strictly minis-
terial duties.   But this, it seems to me, is altogether un-
necessary; for if the correct conclusion to be drawn from
this division of the powers of the government in the Con-
stitution admits of any real doubt, it is now too late to
change the contemporaneous and long continued con-
struction heretofore given it by the three departments of
the government, tacitly sanctioned by the action of the
several conventions by whom our different constitutions
have been framed, as well as the concurrent usage and
construction, legislative, executive and judicial, in all of
our sister States with similar constitutional provisions
and restrictions.   The practical interpretation so long and
so uniformly held and observed here and elsewhere must
still be maintained and followed.   Political and executive
acts which are committed to official discretion and deter-

mination are subject to political inquiry alone, and not to judicial cognizance; while in respect to those of a different character, which involve no discretion, the courts may inquire, and enforce their performance by *mandamus*.

But there is in fact no conflict between the powers conferred upon these two departments. To execute the law, discharge and fulfill the duties required by the functions of office, or to see that this is done by their subordinates and those upon whom such duties devolve, is one thing— to inquire, expound, interpret and decide the law, and enforce its observance, is altogether another. The first is clearly the discharge of executive or administrative duty, while the second is plainly the exercise of judicial authority.

It can with much less propriety be said that the court by the exercise of jurisdiction in such cases interferes with the executive department, than does an executive officer who refuses to obey a plain command laid on him by the Legislature, or a judgment pronounced by the court, interfere with the constitutional functions of the legislative and judicial departments.

The right to a patent, as between conflicting locators, it must be admitted is a legal right founded in and secured by law, and should be ascertained and determined by its proper construction and application. But if a patent to which the applicant is plainly entitled is willfully withheld from him by the Commissioner, is there no remedy for the wrong done him by the denial or refusal of this right? If so, how and where is it to be asserted? Is the right of the applicant to the patent committed to the final determination of the Commissioner? If so, is he not entrusted with judicial functions? Should it be said the issuing of the patent is an executive act, which does not determine the conflicting rights of adverse claimants, but this must be done by a resort to the courts after the

patent has issued, then I ask, if the court may review the action of the Commissioner, cancel and annul the patent, and require him to issue another, or divest the title out of the party who the Commissioner has decided was entitled to it and vest it in another, who administers his office, the Commissioner or the court who controls his action or moulds it to conform to its decision? Is it any greater interference with his executive functions for the court to interpret the law and settle the conflicting rights of the parties so that the Commissioner may properly discharge his executive duty by a patent to the party legally entitled to it before he has acted than afterwards to review and set aside his decision? Suppose in the judgment of the court it is necessary in order to do justice between the parties that the patent which has been issued should be canceled, but the Commissioner refuses to cancel it, is the court powerless to administer the law and do justice because the Commissioner is an executive officer and cannot be compelled by the court to perform any official duty? Or suppose there is no conflicting claimant to the land, but the Commissioner, without reason and contrary to law, simply refuses to give the applicant his patent (though it may be in his hands ready for delivery), is the right of the party to be held forever in abeyance unless some one else will assert a claim and procure a patent, and thereby enable him to get into court and establish his title? But after the Commissioner has issued a patent and recourse is had to the court for redress by the party whose claim has been rejected, the evidence to establish his right is on file or of record in the office, and subject to the control of the Commissioner.

The law says certified copies of all papers belonging to the office shall be received as evidence. But suppose the Commissioner, believing the court has no jurisdictional authority to review or interfere with his official action, should, for this or any other reason, refuse to

furnish copies of such papers when demanded, is there no legal remedy by which the performance of this official duty may be enforced? (Doyle's case, 1 Brev., 238.)

With more show of reason may it be claimed that the judiciary cannot set aside an act passed by the Legislature because it believes such act unconstitutional. Why should it? The Legislature is an independent department of the government; it is not inferior to the judicial department; it should have the same right to judge of its constitutional powers and functions as the latter; it must be presumed to be equally competent and honest; if it errs, the people can correct its error; responsibility must rest somewhere; if the court set aside its action, and the Legislature will not yield, conflict may ensue. Yet at this day who doubts that the right and duty of doing this is a part of the judicial power conferred by the Constitution on the court? And experience proves the exercise, of this power by the court, like that of enforcing obedience to the law by executive officers in matters wherein they are entrusted with neither judgment nor discretion, tends not to discord but to harmony and unity of action in all the departments of the government. A contrary rule would enable a single subordinate officer of the executive department to thwart the legislative will, obstruct the judiciary, and defy the chief executive officer of his own department. Surely no peculiar theory of government, the exigency of no particular case, should induce us to follow an interpretation which leads to such results. I am therefore of opinion that the proposition announced in the opinion to which I have referred, "that the District Court has not the power and authority under the Constitution to compel an officer of the executive department of the government to perform an official duty," in the broad and unqualified terms in which it is laid down, cannot be maintained, and furnishes no reason for the dismissal of this case.

Opinion of the Court on motion for rehearing.

The facts presented in the petition would, in my opinion, under the rulings of this court in other cases, warrant a *mandamus* if the land for which a patent is demanded had been subject to location at the time appellee sought to appropriate it. If a party has a clear legal right to a patent, although this clear legal right may to a certain extent be dependent upon antecedent questions of law, it has been held the right may be settled by a proceeding of this character. (Commissioner G. L. O. v. Smith, *supra;* Bay City v. State Treasurer, 23 Mich., 500.)

Without wishing to be understood as concurring in the entire argument presented in the opinions of the court heretofore rendered by our predecessors, I conclude by saying that I concur in the conclusion reached by them that the land in question had been severed from the mass of the public domain, and was not subject to location at the date of appellee's file. The motion for a rehearing should therefore be overruled.

I am authorized to say that Mr. Justice Gray, who was a member of the court when this motion was argued and submitted to us, expressed before his resignation his concurrence in the disposition now made of it.

REHEARING REFUSED.

NOTE.—I deem it proper to say that my opinion in this case was prepared before I was aware that it was the intention of the Chief Justice to present in a written opinion his views upon the question which I have discussed. And as our mutually decided convictions and the fact that it had been fully considered by the other members of the court in the case of Bledsoe v. The International Railroad Company rendered its discussion in the consultation unnecessary, I was uninformed as to the reasons upon which he based his conclusion, except as I inferred them from his previous official action. Nothing which I have said can therefore be regarded as a comment upon any of the positions assumed in his opinion or as a rejoinder to his arguments in their support.

I may also add that, as I was disqualified from sitting in the Bledsoe case, I was uninformed of the views to be presented by Mr. Justice Devine in his separate opinion in that case until it was read to the court on the day before its adjournment, or I might have avoided trespassing upon some of the ground occupied by him.          GEORGE F. MOORE.

REEVES, ASSOCIATE JUSTICE.—I concur in overruling the motion for rehearing and that the judgment of the District Court should be reversed because the lands were not subject to location and survey. My opinion is not based on any want of jurisdiction of the District Court to award the writ of *mandamus* against the Commissioner of the Land Office in a proper case. I refer to my dissenting opinion in the case of Bledsoe v. The International Railroad Company for my views on this question, and concur generally with Justice Moore in his opinion in the present case.

DEVINE, ASSOCIATE JUSTICE.—I concur in overruling the motion for a rehearing and that the judgment of the District Court rendered in this case shall be reversed, the lands not being open to location and survey. My concurrence does not arise from any doubt as regards the jurisdiction of this court to issue a *mandamus* against the Commissioner of the Land Office in a proper case. I refer to my dissenting opinion in the case of Bledsoe v. The International Railroad Company, and I concur generally in the opinion delivered by Justice Moore in the present case.

ROBERTS, CHIEF JUSTICE.—This was a suit for *mandamus* instituted in 1871 by George W. Wright to compel the Commissioner of the General Land Office of the State of Texas to issue to him a patent to lands which he had located and surveyed by virtue of a land certificate for the unlocated balance issued to Henry Buckler, for six hundred and forty acres of land, assigned in writing to said Wright by Eliza Higgins, widow of Henry Buckler, and her present husband, William L. Higgins, and Isabella Buckler, claiming to be the widow and heir of Henry Buckler; to which written transfer of said certificate is attached the private acknowledgment of the said

married woman, taken before a justice of the peace in the State of Arkansas. This land certificate was located and surveyed on lands known as the "State sections" within the Memphis, El Paso and Pacific Railroad Reservation. The Commissioner appeared, by the Attorney-General, and demurred to the petition of Wright, and justified his refusal to issue the patent on the ground that the lands located and surveyed by Wright were, by the Constitution and laws of the State in force, reserved from location by virtue of such certificate.

The only evidence before the court was a certified copy of the papers on file in the General Land Office. The court below determined (the case being submitted to the court on the pleadings and on said certified copy of the papers in the Land Office) in favor of the plaintiff, and awarded a peremptory *mandamus* against the Commissioner, from which judgment an appeal was taken and brought into this court in 1872.

The Supreme Court in 1872 delivered an opinion and rendered a judgment reversing the judgment below and dismissing the suit. At the same term a rehearing was granted. In 1873 the Supreme Court delivered another opinion, sustaining the first, and confirming its own judgment already rendered in the case.

At the same term, in 1873, another motion for rehearing was made by Wright, which was continued at the last term and the judgment suspended to await the determination of the motion for rehearing. The case now stands before this court upon that motion for rehearing. It has been argued before the court to enable its present members to determine upon the propriety of granting the rehearing.

Having examined into the merits of the case and jurisdiction of the court, and finding no ground to believe that a rehearing would result in any substantial change in the judgment of the court already rendered by our

predecessors on the bench at a former term, and in support of which they had delivered two opinions, I was inclined to join in simply refusing the motion without an opinion, thereby leaving the case to be a decision of our predecessors made at a former term.

As, however, it has been deemed appropriate by some of my brethren—the court now being full, with all the regular members on the bench—to express an opinion upon the question of jurisdiction on account of an opinion lately delivered, wherein there was a divided court and a special justice on the bench (Bledsoe v. The International Railroad Company), I deem it an opportune occasion to present my own views upon the question of jurisdiction in this case, having been in part expressed previously in the case of Randolph v. H. T. and B. Railroad Co., 24 Texas, 317. It is proper, also, that I should say that the majority of the court, of which I was one, in the International Railroad case, did not intend, in making that decision, to influence the decision of this or any other case against the Commissioner of the General Land Office by the reasons given or arguments used therein. Nor is anything designed to be said in this opinion by way of aiding or supporting what is decided in that case, being fully satisfied that the opinion in that case is amply able to stand alone.

In this opinion it is designed to present the provisions of the Constitution, the statutes and previous decisions of this court, so as to furnish the materials within themselves sufficient to enable a judgment to be formed of the true merits of the case. This, and a want of time at the close of a long session, will necessarily lengthen it beyond what might be desirable, and prevent it from having the system that might otherwise be given to it.

My opinion is, that the *mandamus* will not lie in this case, on the following grounds :

1. A *mandamus* cannot be legally issued to any one of

the heads of the executive department in the State of Texas to compel him to exercise any power in the performance of an official function confided to him as such executive officer by the Constitution and laws of this State.

2. That the issuing of the patent under the law and facts as presented in this case is the exercise of a power in the performance of such an official function so confided to him.

3. That the Commissioner of the General Land Office, under and by virtue of the Constitution of the State of Texas adopted in 1869, and the laws of the State consistent therewith, is one of the heads of the executive department in the government of the State of Texas.

There might be other objections raised upon a rigid examination of it; such as, that it is an agreed case to get a legal opinion from the court; the proof of the facts pretermitted, and not examined into by the court below; defect in the mode of proving the right of the plaintiff below to the certificate, and in his consequent right to sue; and defect in parties to the suit, it being *ex officio* known to the court that Kuechler, former Commissioner, is not now in office. These, however, are matters peculiar to this case, and will not be noticed otherwise than incidentally, if at all, not being necessary to accomplish the purpose of this opinion.

It may be well to give by way of introduction what is said of the writ of *mandamus* as a remedy in law books and decisions that treat of the subject.

"A writ of *mandamus* is in general a command, issuing in the king's name from the Court of King's Bench, and directed to any person, corporation, or inferior court of judicature within the king's dominions, requiring them to do some *particular* thing therein specified, which appertains to their office and duty, and which the Court of King's Bench has previously determined, or at least

supposes, to be consonant to right and justice." (2 Cooley's Blackstone, 110.)

" To render the *mandamus* a proper remedy, the officer to whom it is directed must be one to whom, on legal principles, such writ may be directed, and the person applying for it must be without any other specific and legal remedy. * * * Questions in their nature political, or which are by the constitution and laws submitted to the executive, can never be made in this court." (1 Cranch, 279.)

" It lies where there is a refusal to perform a ministerial act involving no exercise of judgment or discretion. It lies also where .the exercise of judgment and discretion are involved and the officer refuses to decide, provided that if he decided the aggrieved party could have his decision reviewed by another tribunal. * * * * * It is applicable only in these two classes of cases. It cannot be made to perform the functions of a writ of error." (Commissioner v. Whitley, 4 Wall., 534.) Nor can it be used so as to act as an appeal from the determination of the officer in the exercise of executive functions. (17 Howard, 225 ; 7 Wall., 352.)

As all the decisions assert that the act required to be done by one of the high executive officers must be a ministerial act, and that where public duties are confided to him by law "he is not subject to the control of the courts in the exercise of the judgment and discretion which the law reposes in him as part of his official functions" (9 Wall., 312), it may be well to furnish one of the numerous attempts that have been made to define or describe this distinction between ministerial and official acts, which it may become material to quote and notice more particularly hereafter.

" The distinction between ministerial and judicial and other official acts seems to be, that where the law prescribes and defines the duty to be performed with such

precision and certainty as to leave nothing to the exercise of judgment or discretion, the act is ministerial; but where the act to be done involves the exercise of discretion or judgment in determinining whether the duty exists, it is not to be deemed merely ministerial." (5 Texas, 479.)

A reference to the two acts (and it is believed to be the only two acts which have been adjudged by the Supreme Court of the United States, during its existence of over eighty years, to have been such ministerial acts) will, perhaps, serve to aid somewhat in a proper understanding of such definitions.

"Where a commission to a public officer" (a justice of the peace in District of Columbia) "has been made out, signed and sealed, and is withheld from the person entitled to it" (by the Secretary of the United States), "it is a plain case for a *mandamus* either to deliver the commission or a copy of it from the record. (Marbury v. Madison, 1 Cranch, 268.)

The facts in the second case were, that Stokes *et al.* were mail contractors, and had their credits allowed and accounts adjusted in the Postmaster-General's Office while W. T. Barry was in that office. His successor, Amos Kendall, struck out and disallowed part of the allowances and credits. Congress passed a law directly requiring the Postmaster-General to credit Stokes *et al.* with whatever sum of money the Solicitor of the Treasury (to whom the same law referred the matter to be settled and the result to be reported to the Postmaster-General) should decide to be due them. The report of the Solicitor being made, the Postmaster-General still withheld the credit. (By the laws of the United States then in force, the account as made out in the department would have been *prima facie* evidence as to the state of the account, in a suit against Stokes *et al. Brightley's Digest*, 862.) Suit of *mandamus* being brought against Kendall, the Supreme Court say:- "He was simply required.

to give the credit. This was not an official act in any other sense than being a transaction in the department where the books and accounts were kept, and was an official act in the same sense that an entry in the minutes of the court pursuant to an order of court is an official act."

Justice Catron, in the case of Decatur v. Paulding, 14 Peters, 521, gives the following quotation and explanation of this decision: "He was (say the court) simply required to give the credit, and this was no more an official act than making of an entry by a clerk, by order of a court of justice; it was in every just sense a mere ministerial act." He adds: "*Had it not been placed on this narrow ground, the decision of the court could not have been made.*" Diligent search has been made through the decisions of the Supreme Court of the United States, and this is the first and last and *the only case* that has been found in which a *mandamus* has been sustained in that court against any one of the heads of the executive department of the government.

The first one, Marbury v. Madison, though it seems to have originated the doctrine in this country, by an opinion of transcendent ability—studied and artistic as an argument—was on a point not necessary to be decided in the case for want of jurisdiction in the court, it being an original suit filed in the Supreme Court of the United States, of which that court, being an appellate court (with a few express exceptions), had no jurisdiction to try and determine. All the fact necessary to determine their right to act was the original petition or application for the writ alone. All of the opinion based upon facts outside of and beyond that was a mere *dictum* of the court, and upon that *dictum* the subsequent decisions were based so far as it was followed at all.

The questions arising upon the right of a court to award a *mandamus* to any of the high executive officers of the State bring into consideration the structure and

operations of the government far more extensively than usually attend legal investigations, and necessarily invite to a much broader view of the subject. Those who advocate a liberal exercise of this power by the courts usually base it upon certain general propositions, announced as axiomatic truths in a government of constitution and laws, such as the following: "No man or body of men, officer or citizen, is above the law, and all are bound to obey the law." "For every legal right, when withheld, there must be a legal remedy." "It is the peculiar province of the courts to construe, declare, and enforce the law in vindication of the legal rights of the citizen."

Without entering into a minute discussion of how far these propositions are theoretical, and with what qualifications they must be subject in the practical operations of any government, it will suffice to embrace them all in one general exposition, which is, that in every organized government there must of necessity be a finality—a finality in the determination of the rights of individuals, in whatever departments they may arise or pertain to, and some man, or set of men, must make the final determination. In a despotism, such one man is easily pointed out. In a republican state, such as ours, wherein all of the powers of government are divided into three distinct departments, there must be a final determination of each department for itself of all such matters as are assigned to it in the division. Otherwise there is no division—no binding, effective, and "distinct" division of powers. The framers of our Constitution were determined to leave no equivocation or doubt on that subject, if it were possible to prevent it by plain words.

"ARTICLE II.—DIVISION OF THE POWERS OF GOVERNMENT.

"SECTION 1. The powers of the government of the State of Texas shall be divided into three distinct depart-

ments, and each of them be confided to a separate body of magistracy, to-wit: those which are legislative to one, those which are executive to another, and those which are judicial to another; and no person or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others except in the instances herein expressly permitted."

The departments of government shall be distinct; that is, so separated as not to be confounded with each other. To make this doubly sure, it is also added in effect that they shall be kept separate in person and in action. A judge, for instance, shall not be an Attorney-General, nor shall he exercise any power properly attached to the office of Attorney-General; such, for instance, as giving advice to the Commissioner of the General Land Office about how to discharge his official duties; nor can he be called on or required so to do, even though the Legislature should pass a law requiring him to do it.

That is simply because the Constitution in plain terms forbids it.

The division made by the Constitution in and of itself produces co-ordinancy in the three departments, and the separate indepenence of each one from any conjunction with, or control by, the others in their allotted sphere of action. If this be not so, then there is no division. If one department may exercise its duties according to its own judgment, except when another department choses to control it and make it perform its duties in another and different way from that dictated by its own judgment, then in that event there has been no division of the powers of government into three distinct departments, and Section 1 in Article 2 of the Constitution means nothing.

The duties of each of these departments in relation to the rights of individuals involve matters of law and of

fact to be determined on; and when a final determination has been reached in any department to which the subject matter properly belongs, there is no power in another department to order that final determination to be changed or reversed by the department first making it. If the Governor will not sign a patent or a commission, who can order him to do it and make him obey? If the Supreme Court will not decide a case when they can and ought to do it under the law, who can order them to do it? If the Legislature will not vote an officer his salary to which he is entitled under the organic law, who can order the Legislature to do their duty and make them do it? Each department may have its own reasons for not acting, or, if possible, none at all. The land locator who failed to get his patent, the litigant demanding a decision in the Supreme Court, and the officer who had asked for his well-earned salary, have each found whether or not every man or set of men are bound to obey the law, whether or not there is a legal remedy for every legal right withheld, and whether or not it is the peculiar province of the courts to construe, declare, and enforce the law in vindication of the rights of an injured citizen.

But suppose they act according to their judgment instead of refusing to act, and act contrary to the interest and supposed legal right of the several applicants, what remedy have they to coerce different action? That the independent separate action and co-ordinancy of the three distinct departments in dealing with the rights of the individual involving facts and the law relating thereto may be further illustrated, let it be supposed that a locator applies to the Land Office for a patent, and presents to the Commissioner a certificate, a transfer to himself, and a survey. These are all facts involving law questions in determining their sufficiency. The Commissioner examines his maps in connection with the survey to fix the locality of the land; and other titles in his office

if necessary to ascertain whether the land is vacant or not; he finds the land has been previously appropriated by a Spanish or Mexican grant; he examines into the facts relating to that title; he turns then to the various laws affecting the validity of the old grant; and upon full consideration of the facts and the law he determines that the owner of the old grant has a vested right of property in the land, and he having determined that for himself refuses the patent to the locator. Now if the Commissioner is an executive officer, not subject in that particular determination to the control of any other department, it is a finality as to the issue then presented. The locator may stand upon his certificate thus located, and contest the validity of the old grant in a suit in court, and the court may determine that he has the better title, and, if so determined by the court of last resort, that will be a finality as to the issue then presented, and no other department can cause it to change that final determination. If the locator instead of applying to the Land Office had applied to the Legislature, submitted his facts to their consideration, and had procured a declaration of annullment of the old grant and a legislative grant of the land by metes and bounds to himself, the owner of the old grant might institute a suit in court and have his adjudged to be the better title to the land.

Thus each department may act as a check upon the others, by each acting independently in its own sphere—the check being rather negative in relation to the other departments than positive and affirmative control over them. It is thus the three acting in separate independence, and at the same time in harmonious co-ordinancy and co-operation, that good government may be accomplished. It is deemed sufficient to quote one remark of the court in the case of Kendall v. The United States, in which it is said: "The theory of the Constitution undoubtedly is, that the great powers of government are

divided into separate departments, and so far as these powers are derived from the Constitution the departments may be regarded as independent of each other." (12 Peters, 609.)

The remaining question to be presented in this connection is, does the Commissioner of the General Land Office belong to the separate body of magistracy to whom are confided the executive powers of the government of the State of Texas? The most perspicuous answer to this question is made by a quotation from the Constitution and laws, with a brief reference to his official duties thereunder.

"ARTICLE IV.—EXECUTIVE DEPARTMENT.

" SECTION 1. The executive department of the State shall consist of a chief magistrate, who shall be styled the Governor, a Lieutenant Governor, Secretary of State, Comptroller of public Accounts, Commissioner of the General Land Office, Attorney-General, and Superintendent of Public Instruction."

Section 22, after prescribing the manner of the election of the Commissioner, and that his term of office and qualifications shall be the same as those of the Governor, says further: "He shall be the custodian of the archives of the land titles of the State, the register of all the land titles hereafter granted, and shall perform such other duties as may be required by law."

Other sections of the same article prescribe the duties of the other heads of the executive department.

Article 10 establishes the General Land Office at the seat of government, and authorizes the Legislature to establish such subordinate offices as they may deem expedient.

Various laws have been passed, and are now in force, authorizing the Commissioner to appoint a corps of

42

draftsmen, translators and clerks, for the dispatch of the business of his office, and prescribing various duties relating to the perfecting and securing of land titles. It is provided also that he shall have a seal, and that "all patents for lands emanating from the government shall be in the name and by the authority of the State, and under the seals of the State and the General Land Office, and shall be signed by the Governor and countersigned by the Commissioner of the General Land Office." (Paschal's Digest, Tit. Land, Articles 4280-1.)

Thus is his position as one of the heads of the executive department secured by a higher sanction than that of the Commissioner of the General Land Office of the United States. It is higher because it is ordained by the Constitution, and not by a law that the Legislature can change or repeal, and because he has a greater independence in the tenure of his office, and thereby is more independent of the control of the chief magistrate. He is elected by the qualified voters of the State, as the Governor is. The fact that he is vested directly, and not mediately through the Governor, with a definite portion of the powers of the executive department can hardly be held to render him any more liable to the control of the judicial department than if he were created by law the minister or official servant of the Governor, subject to his direction and control in the performance of the executive acts confided to him by the Constitution and laws. This constitutional independence in him as a member of the executive department constitutes a limitation upon the powers of the Legislature in prescribing "such other duties" as he may be required to perform. They must be executive, pertaining to his distinct portion of that department. His determinations, though they may and usually do require a consideration of both law and facts, have neither the conclusiveness of judgments nor the force of laws. Nor can the Legislature impose on him

duties extraneous and not pertaining properly to the business of his office. For if they could, they would thereby efface and destroy the specific designation, and break down the barriers of the division of the powers of government made by the Constitution, which it is not within the power of any law to do, whatever may be, or may have been, its source. (Marbury v. Madison, 1 Cranch; Cooley's Constitutional Limitation, and cases cited, pp. 115, 116.) For the same reason a judge, as belonging to a different body of magistracy, cannot by law be required to exercise any power properly attached to the Commissioner in the official discharge of his executive duties, unless it can be found to be an excepted "instance" which has been "expressly permitted" in the Constitution itself. (See end of Article 2, Section 1, Constitution of 1869.)

This leads us to look to the judicial department to see if an instance of exception to the distinct division of the powers of government can be found there expressly permitted.

"ARTICLE V.—JUDICIAL DEPARTMENT.

"SECTION 1. The judicial power of this State shall be vested in one Supreme Court, in District Courts, and in such inferior courts and magistrates as may be created by this Constitution, or by the Legislature under its authority." 　＊　＊　＊

"SEC. 3. The Supreme Court shall have appellate jurisdiction only, which, in civil causes, shall be coextensive with the limits of the State." (And by the late amendments, "in criminal causes" also.) 　＊　＊　＊　＊　＊
"The Supreme Court and the judges thereof shall have power to issue the writ of *habeas corpus;* and under such regulations as may be prescribed by law may issue the writ of *mandamus*, and such other writs as may be necessary to enforce its own jurisdiction." 　＊　＊　＊

"SEC. 7. The District Court shall have original juris-

diction of all criminal cases;    *    *    *    *    and of all suits, complaints, and pleas whatever, without regard to any distinction between law and equity, when the matter in controversy shall be valued at, or amount to, one hundred dollars, exclusive of interest ; and the said courts, and the judges thereof, shall have power to issue the writ of *habeas corpus*, and all other writs necessary to enforce their own jurisdiction and to give them a general superintendence and control over inferior tribunals."

It is to be noticed that in the above section conferring jurisdiction upon the Supreme Court there is given the power to issue the writ of *mandamus*, which is not expressed in the section defining the jurisdiction of the District Court. The use and purpose for which the writ of *mandamus* was permitted to be issued by the Supreme Court and the judges thereof, as well as the connection in which it is found, with "such other writs as may be necessary to enforce its own jurisdiction," rebuts the conclusion that it was designed by the fact of naming that writ to confer on that court and the judges thereof any transcendent power of government over and above that which had been conferred upon them as a portion of the judicial department. Had it been so intended, the exception in their favor of the exercise of a power not judicial in its character should have been indicated as " expressly permitted," as it was provided it should be in the 2d Article of the Constitution, and should not have been left to be deduced by implication and inference from the use of the word *mandamus*, so connected in the sentence in which it is used as to militate against any such intention. Much less could any such intention be presumed in reference to the powers conferred on the District Court by the Constitution in defining its jurisdiction. (McIntire v. Wood, 7 Cranch, 504; Graham v. Norton, 15 Wall., 427.) In other words, we find nothing here that consti-

tutes an exception in favor of the judicial department in the general division and distribution of the powers of the government. No other part of the Constitution expressly *permits* any portion of the judicial department to exercise the powers confided to the heads of the executive department, or *to cause them to perform* their executive powers, or to receive, entertain, and *decide* an appeal from their determinations, made in the official performance of their executive duties.

It follows from these principles that the executive has no power to order the courts to render their judgments in a particular way, nor have the courts any power to order the executive to perform his official functions done in the discharge of his executive powers and duties in any particular way contrary to his own determination on the law and facts involved therein. For if they can, they are in effect exercising the powers confided by the Constitution to the executive, on the principle of the rule of universal application—which cannot be evaded by indirections—that what one does by or through another, he does himself; and even stronger still, what one forces another to do against his will, he does himself, and is generally alone responsible for it.

The views here announced may not in the main be contested as to the executive duties to be performed by the chief magistrate—the Governor of the State. But it is denied that they apply in the same degree to the several heads of the executive department, and particularly to the Commissioner of the General Land Office.

This is contended for on the grounds that the enumeration of the Commissioner as one of the officers of the executive department is merely formal, that he performs the same duties and is subject to the same control of the courts by the writ of *mandamus* as he was formerly when his office was created and his duties prescribed by the acts of the Legislature and by the laws generally, and

that the District Court at the seat of government, under the constitution and laws of the State, including the English Common Law, adopted in 1840, and now in force (except so far as it is not inconsistent with our Constitution and statutes), is authorized to issue to him a *mandamus* requiring him to issue a patent, upon his refusal, when it shall be established *in court*, upon a trial of the cause, that according to the facts and law applicable thereto he ought to issue it.

This induces a retrospect into the state of the law and decisions in this State upon the subject of *mandamus*.

The Constitution of 1845 as well as those subsequently adopted contain substantially the same provisions in reference to the jurisdiction of the courts as that of 1869, previously quoted. They contained the same division of the powers of government into three distinct departments, vested in the Governor alone the executive powers of the government, and provided for a General Land Office, but the Commissioner was not mentioned, nor were his office or duties prescribed.

By the act of the Legislature the jurisdiction of the District Court was defined by reiterating in substance the powers conferred in the Constitution, to which was added, "and generally to do and perform all other acts pertaining to courts of general jurisdiction." It was also provided in the same act that "The judges of the District Courts and each of them, either in vacation or term time, shall have authority to grant, on petition to them therefor, writs of *habeas corpus*, *mandamus*, injunction, sequestration, error, and *supersedeas*, and all other remedial writs known to the law, returnable according to law; *provided*, that no *mandamus* shall be granted on an *ex parte* hearing, and any peremptory *mandamus* granted without notice shall be deemed void; *and further provided*, that all writs of *mandamus* sued out against the heads of any of the departments or bureaus of government shall be

returnable before the District Court of the county in which the seat of government may be." (Paschal's Digest, Articles 1405, 1407.)

These are the only laws and statutes in force in the State of Texas relating to the writ of *mandamus*, and which alone have been in force since they were enacted in 1846, except the common law as applicable thereto. The adoption of the common law of England in 1840, and its continuance in operation to the present time, does not bring with it and make of force in this State the English statutes extending from 9 Anne to 6 and 7 Victoria, as late as 1843; nor the rules of practice under them in the English courts, by which the proceedings under the writ of *mandamus* have to a large extent been assimilated to though not made regularly in all respects a personal action. (Tapping on *Mandamus*, marginal page, 439-454; Id., 282, marginal page and following, as to proceedings under, etc.) Under this state of the law, the question was presented to the Supreme Court in 1849 of the right of the court to award the writ of *mandamus* against the Commissioner in a case involving the full exercise of his official judgment upon the facts and law relating to the issuing of a patent upon certificates located and surveyed upon the land. The court decided in favor of the right of the court to entertain jurisdiction of the case as a proper one for the writ, but decided against the issuance of a peremptory *mandamus* upon the merits of the case. (Commissioner v. Smith, 5 Texas, 471.)

The court in that case say: "The first question here presented can scarcely be considered now as an open question. The practice of resorting to this proceeding against this officer and to enforce the performance of this particular duty is believed to have had its origin almost as early as the creation of the office itself, and to have been continued without a question as to its legality down to the present time." (2 Texas, 581.) But the right to

this remedy in a case like the present rests upon other authority than the practice of courts. By a statute of the Congress of the Republic, approved January 25, 1841 (5 Statutes, 84, Sec. 9), it is enacted that "all writs of *mandamus* sued out against the heads of any of the departments or bureaus of the government shall be made returnable before the District Court at the seat of government." It is well known that this statute was adopted in consequence of a practice then prevailing of calling upon the Commissioner of the General Land Office, by process from the courts of remote counties, to show cause against the issuing of this writ in cases like the present in such distant counties. This act certainly recognizes the right to obtain the writ at the seat of government. It must moreover be regarded as a legislative recognition of the legality of the practice then existing of employing this writ as a private remedy, for it was its use as such which the Legislature undertook to regulate. The use of the writ as a private remedy seems to be comformable to modern practice. A part of the same section in the act of 1841 provided that "the several judges of this Republic in issuing writs of *mandamus* are hereby directed to observe the rules which govern writs of *mandamus* at common law as modified by the statutes of this Republic." And by this same section it was declared that the Rules of Practice adopted by the Supreme Court in 1840, authorizing a peremptory *mandamus* before notice, was contrary to law. (See Acts 3d Cong., p. 84; and for Rules see 1 Texas, 852.)

There was then no additional statute relating to *mandamus* except that defining the jurisdiction of the District Court, by which the judges were given the right "to grant the writs of *habeas corpus*, *mandamus*, injunctions, *supersedeas*, and all other remedial writs known to the law." (Laws 1st Cong., p. 200, Sec. 4, approved December 22, 1836.)

The two cases decided by this court, in which the per-emptory writ was granted against the Commissioner, pre-vious to the opinion in 1849 above quoted, were Horton v. Brown, 2 Texas, 78, and Ward, Commissioner, v. Townsend, 2 Texas, 581, decided in 1847; the first of which was a suit between two litigants in relation to the right to land, commenced in 1839, in the county of Bas-trop, and the writ to the Commissioner was incidental to the suit, and awarded upon a reversal and reform of the judg-ment below. The decision was made by two judges alone, and one of them a special judge. In the second there was no statement of facts, and the rule was therein adopted that in the absence of a statement of facts "the legal intendment is in favor of the judgment." In neither of these two cases was the right to the writ argued by the attorneys or discussed by the court. The two cases in Dallam's Digest have no reference to the Commissioner of the General Land Office.

Having brought to view the previous laws and decisions of this State that were referred to and were in contempla-tion of the court in making the decision in the case of Commissioner of General Land Office v. Smith, in 1849 (5 Texas, 471), it may be well to make another reference to the opinion, so that the legal principles there laid down and afterwards followed in one and announced in sev-eral, as to the Commissioner, may be fully and certainly understood. After announcing the rule extracted from the decisions of the Supreme Court of the United States, that a *mandamus* will issue to an officer of the govern-ment only when the duty to be performed is ministerial in its character, and not when the performance of the duty requires judgment and discretion, the learned jus-tice conveys his own view of "the distinction between ministerial and judicial and other official acts." As au-thority for which he cites 12 Peters, 524, 609; 14 Peters, 497; 7 Cr. R., 504; 6 Wheat., 598; 6 How. R., 92, 100,

101, 102; B. L. Com. v. Bell, Dallam, 366; Monthly Law R., N. S., Vol. 1, No. 9, p. 399.

To illustrate his view of the distinction still more clearly he proceeded to say in the same connection: "There are various duties assigned by law to the Commissioner of the General Land Office to be performed before the patent can issue. He must pass upon the validity of the certificate and the survey; he must determine whether both are of such a character as, under the law, to entitle the party to a patent; he must also determine whether the land sought to be conveyed was vacant when located, or was appropriated by any previous claim which he is required by law to respect. When these and such other questions as may address themselves to the Commissioner, under the laws prescribing his official duties, shall have been resolved in favor of the applicant, his right to his patent is clear and indisputable. The issuing of the patent then becomes a mere ministerial act, involving no exercise of judgment, and one which the Commissioner has no discretion to refuse. To withhold it would be the violation of a vested right."

Further on, he says: "We conclude that a *mandamus* may issue to compel the Commissioner of the General Land Office to issue a patent when it shall have been made to appear *to the court* that the right of the party is clear, and that it has been refused by the Commissioner." (5 Texas, 479, 480.)

Here is presented a supposed case of the most common occurrence, and of the highest order of the exercise of official duties, involving questions of law and fact at every step of the investigation, for the determination of which it is often required that all of his powers of judgment and discretion must be put forth to perform his duty.

It is just such a case as the one we now have before us of Kuechler v. Wright. In all the other cases against the

Commissioner the same doctrine is practically held, not-
withstanding but one other case has been found since that
opinion was delivered wherein the peremptory writ was
adjudged to be ordered. (H. & G. N. R. R. Co. v.
Kuechler.) In that case both law and fact were required
to be judged of in the discharge of his official duty, and
it could not have been decided with any reference to
whether or not the act required to be performed was a
ministerial act, in contradistinction to one requiring the
exercise of judgment, as that distinction is drawn in the
decisions of the Supreme Court of the United States, but
simply followed in the track of the former decisions made
in this court before the adoption of the Constitution of
1869, which made the Commissioner one of the constitu-
tional heads of the executive department. There has
never been a judgment rendered by the Supreme Court
of Texas awarding a writ of *mandamus* against the Gov-
ernor, the Attorney-General, the Secretary of State,
Comptroller of Public Accounts, Treasurer, or against
the Auditorial Board, and only three against the Com-
missioner of the General Land Office.

In view of all the matters here presented, what is the
legitimate conclusion to be drawn from the opinion of
Justice Wheeler in Commissioner General Land Office v.
Smith, 5 Texas, which has been frequently announced
and followed in one case against the Commissioner since
it was delivered? The answer seems inevitable that he
was regarded by the court as a mere ministerial officer,
whose office was created and whose duties were prescribed
by the acts of the Legislature, whose office was a sort of
bureau or mere commission of inferior grade, whose acts
were neither directed by nor could take shelter under the
executive department. The distinguished counsel (Volney
E. Howard) who argued against the *mandamus* seems to
have taken it for granted in his brief that the Commis-
sioner was then a ministerial officer. (5 Texas, 477.)

Indeed if the case supposed by Justice Wheeler in his opinion, involving as it does the whole range of facts and law as does now the case before us of Kuechler v. Wright, is a case wherein he is required to perform a ministerial act only, then it must of necessity follow that he then performed no other than ministerial acts. For he performs none other more complex, more difficult, or of a character to require more official information and the exercise of more discretion and judgment than in the supposed case. The statutes of 1841 and 1846, recognizing the right of the District Court at the seat of government to issue the writ of *mandamus* against the heads of departments and bureaus, can surely not be construed to authorize the use of the writ to review and revise, as if upon appeal, all the proceedings of the heads of the executive department, or to confer the power as to them further than to ministerial acts.

It is of the first importance that this matter should be thouroughly understood as a starting point to the further consideration of whether or not a *mandamus* can be sustained against the Commissioner under the facts of this case, now that he has been made a constituent portion (by designation) of the executive department in the government of the State of Texas; and it is for that reason that pains have been taken in this opinion to bring out and present to view everything by which an intelligent conclusion could be arrived at from the matters so presented.

We are admonished that it is of very great importance in another point of view when we turn to the late decision of the Supreme Court of the United States in the case of Davis v. Gray, wherein the court sustain an injunction against the Governor and Commissioner of the General Land Office restraining them from issuing patents to certain lands claimed as reserved to the Memphis, El Paso and Pacific Railroad Company, in which it is said, in reference to suits wherein the State is interested through

its officers, as in this case now before us : "According to· the jurisprudence of Texas, suits of this character can be maintained against the public officers who appropri-- ately represent her touching the interests involved in the-- controversy.   In the application of this principle there is no difference between the Governor of the State and the officers of a State of lower grades.   In this respect they are upon a footing of equality.   A party by going into a national court does not lose any right or appropriate- remedy of which he might have availed himself in the· State courts of the same locality.   The wise policy of the Constitution gives him a choice of tribunals.   In the former he may hope to escape the local influences which sometimes disturb the even flow of justice.   And in the· regular course of procedure, if the matter be large enough, he may have access to this tribunal as the final arbiter of his rights.   Upon the grounds of the jurispru- dence of both the United States and of Texas, we hold this bill well brought as regards the defendants" (that is the Governor and Commissioner of the General Land Office of Texas).   (16 Wall., 221–2.)   That suit was· brought in the Circuit Court of the United States for the· Western District of Texas, since the adoption of the Constitution of 1869, and was decided in the Supreme· Court of the United States at the December term, 1872, upon the authority of the cases cited therein, of Texas decisions, to-wit :  Ward v. Townsend, 2 Texas, 581; Co- hen v. Smith, 3 Id., 51;  Commissioner General Land Office v. Smith, 5 Texas, 471;  McLelland v. Shaw, 15- Texas, 319;  Stewart v. Crosby, Id., 547;  H. and G. N. Railroad Company v. Kuechler, 36 Texas, 382.

Every one of these Texas cases (except the last, which simply follows the others) are based upon the principles· announced in the case of Commissioner v. Smith, as be- fore shown, and, as it is believed, cannot be placed upon any other principle than that the Commissioner was a

ministerial officer, and was not then regarded or treated by the courts of Texas in passing upon his acts as one of the heads of the executive department of the State of Texas.

It might be appropriate in reference to the case now before us to see in what light the Commissioner of the General Land Office of the United States is regarded by the Supreme Court of the United States.

It was decided by the Supreme Court of the United States that a writ of *mandamus* would not issue to the Commissioner of the General Land Office in a case involving the exercise of judgment upon a complication of facts, or, to use the language of the court, which "calls for the exercise of the judicial functions of the officer," and it is added, in reference to whether a writ would lie against him at all, "we have found no case in which this power has been exercised." (5 Wall., 565, U. S. v. Comr.)

The case of Gaines v. Thompson was an injunction against the Secretary of the Interior and Commissioner of the General Land Office to restrain them from canceling an entry under which lands were claimed. In denying the right to the injunction, which was regarded as being analogous in principle to *mandamus* (as was done in the case of Davis v. Gray, above quoted), the court say: "A ministerial duty, the performance of which may in proper cases be required of the head of a department by judicial process, is one in which nothing is left to discretion."

"The action of the officers of the land department with which we are asked to interfere in this case is clearly not of this character. The validity of plaintiff's entry which is involved in their discretion is a question which requires the careful consideration and construction of more than one act of Congress. * * * * It is far from being a ministerial act under any definition given by this court." (7 Wall., 353.)

The same opinion, quoting and applying to that case with approbation a part of the opinion of Chief Justice Taney in the case of Decatur v. Paulding, 14 Peters, 497, says: "The court could not entertain an appeal from the decision of one of the secretaries, nor revise his judgment in any case where the law authorized him to exercise judgment or discretion. Nor can it by *mandamus* act directly upon the officer, and guide and control his judgment or discretion in the matters committed to his care. * * * The interference of the courts with the performance of the ordinary duties of the executive department would be productive of nothing but mischief, and we are quite satisfied that such a power was never intended to be given to them." (7 Wall., 352.) What is here said may be applied with equal or greater force to the case before us: that a careful consideration and construction of more than one law has to be made by the Commissioner; that it requires judgment and discretion both as to the law and to the facts; that a *mandamus* sustained would be the act of the court in guiding and directing his judgment or discretion in the ordinary exercise of his official duties; and that it would in effect be entertaining and passing upon an appeal in a regular trial *de novo* from his determination—as much so, indeed, as an ordinary appeal or *certiorari* from a justice's court to a District Court. (Decatur v. Paulding, 14 Peters, 515.)

A *mandamus* cannot be made to perform the functions of a writ of error, nor be made to subserve the purpose of deciding a legal question merely as devised and obviously intended in this case. (Commissioner of Patents v. Whitley, 4 Wal., 534, 523; Tapping on *Mandamus*, 68.)

"When the duty is not strictly ministerial, but involves discretion and judgment, like the general doings of a head of a department, as was the respondent here, and as was

the case here, no *mandamus* lies." (Reeside v. Walker, 11 Howard R., 290.)

A third and still later case may be referred to, which, if possible, still more strongly enforces the doctrine that the Commissioner of the General Land Office cannot be required by *mandamus* to issue a patent to land. It is the case of the Secretary of the Interior v. McGarrahan, 9 Wall., 312, 314, in which it is held that "though *mandamus* may sometimes lie against an executive officer to compel him to perform a mere ministerial act required of him by law, yet such an officer to whom public duties are confided by law is not subject to the control of the courts, in the exercise of the judgment and discretion which the law reposes in him as part of his official functions." After referring to the case of Kendall v. The United States, 12 Peters, 608, in which it had been decided that a writ of *mandamus* could be issued to enforce the performance of a purely ministerial act by one of the heads of the executive department, the opinion proceeds to say: "Subsequent decisions of this court have affirmed the same principle. But in all of the subsequent cases the principle is strictly limited to the enforcement of mere ministerial acts, not involving the necessity of taking proofs, and it has never been extended to cases where controverted matters were to be judicially heard and decided by the officer to whom the writ is required to be addressed." As authority for these principles there is cited Decatur v. Paulding, 14 Peters, 497; Brashear v. Mason, 6 Howard, 99; Gaines v. Thompson, 7 Wall., 353; Reeside v. Walker, 11 Howard, 289; United States v. Seaman, 17 Howard, 230; United States v. Guthrie, 17 Howard, 304; Commissioner of Patents v. Whitley, 4 Wall.; United States v. Commissioner, 5 Wall., 563.

To apply the principle established by such an unbroken line of authorities to the case then under consideration, the opinion proceeds: "Patents for land are re-

quired to be signed by the President in person, or in his name by a secretary under his direction, and they are to be countersigned by the recorder of the General Land Office." (4 Statutes at Large, 663; 5 Id., 417; see also the statute of Texas previously quoted, requiring patents to land to be signed by the Governor and countersigned by the Commissioner of the General Land Office.) "Such patents cannot be issued and delivered to any party without the signature of the President, and no proceeding to compel either the Commissioner of the General Land Office or the Secretary of the Interior to issue such patents can be sustained while that provision of law remains unrepealed." (The Secretary. v. McGarrahan, 9 Wall., 314; citing United States v. Land Commissioner, 5 Wall., 563.) No subsequent decision of the Supreme Court of the United States has changed or varied this ruling, and therefore it would be useless to attempt to add any other authority to the overwhelming weight already piled up perhaps superfluously.

These decisions of the Supreme Court of the United States positively deciding against the right of the courts to coerce the issuing of a patent by a *mandamus* to an executive officer were made long after all of the decisions of the Supreme Court of Texas (except that of H. & G. N. R. R. Co. v. Kuechler, in 36 Texas) in relation to the rights of the courts to issue a *mandamus* against the Commissioner of the General Land Office to issue a patent for lands, having all been rendered since 1866.

It might be well to notice that the very authorities cited in the Texas decisions to warrant the *mandamus* against our Commissioner of the General Land Office are the same as those cited by the Supreme Court of the United States to warrant their refusal of it against their Commissioner; and still our decisions are cited by that court to warrant the writ even against the Governor, when such a ruling had never been made by our court as to the

Governor or the heads of departments, but only against the Commissioner, treated as a ministerial officer.

Now in view of these decisions, can it be said with any propriety that in law, or by any mode of constitutional construction of the powers of government, the Commissioner of the General Land Office of the United States, whose office is created and whose duties are prescribed by acts of Congress, occupies a different and higher position in the executive department of the general government than that occupied by the Commissioner of the General Land Office of the State of Texas towards the executive department of the State of Texas since the adoption of the Constitution of 1869, in which he is expressly named as one of the executive officers? Is he still to be treated by the courts as a mere ministerial officer, all of whose official functions of the highest and most complex character can be controlled by the courts of this State? He is as independent in his position as the Governor is, and has a separate line of duty as plainly marked out. His department is equally important with any others. He has the highest title to office that it is possible to confer in this country—by a designation in one of the three departments in the Constitution and by an election by the qualified voters of the whole State. Authorities might be cited to show the view of other courts as to the necessary effect of an officer deriving his authority by designation from the Constitution. (One only as a sample, The People v. The Canal Board, 13 Barbour, N. Y. R., 438.) But why call in aid to confirm that which the Constitution itself positively affirms? So far from this change being made without a purpose by the framers of the Constitution, it is in accordance with the settled tendency, that has been growing and increasing its manifestations in public acts for the last half century, to lessen the direct power and influence of the chief executive by securing the independence of the heads of

departments. All public history attests the fact that
constitutions, laws, and decisions of courts, and the con-
struction of all of them, are progressive, as public events
arouse to action great minds in impressing and infusing
their views into them.  Two such events did occur forty
years ago or over in the public history of this country,
which excited an universal interest and great conflict of
opinion as to what were and what should be the relations
between the different departments of republican govern-
ment.  It was an undeveloped issue which had been long
forming that then blazed forth.  One of them resulted in
fixing strongly in public sentiment the doctrine that the
courts have a controlling power to a certain scarcely defin-
able extent over the executive department, or some of its
officers, and that the decisions of the courts of last resort
constitute the law binding on the other departments.
This has borne all along many fruits in most, if not
all, of the States, and lately some very bitter fruits in a
few of them.  (See Durell case in Louisiana, and cases
in Arkansas and Texas not yet reported, wherein civil
war was the result in two, and nearly reached in the third
State.)

The other event referred to was made the means of
exciting a serious apprehension of danger from uniting
"the sword and the purse" in the hands of the chief ex-
ecutive, which resulted in the effort to secure the inde-
pendence of the different departments, as far as practica-
ble, from the direct control of and discretionary removal
by the chief executive.  This has continually manifested
itself ever since in the constitutions of many of the
States, whose constitutions have been formed or amended
since that time, by naming the several heads of depart-
ments with the chief executive.  (See Constitutions, of
New York, 1846; Maryland, 1851; Virginia, 1851; Ken-
tucky, 1850; Ohio, 1851; Indiana, 1851; Florida, 1838;
Arkansas, 1836; Iowa, 1846; Calafornia, ——.)  Whereas

many of the older constitutions are conformable in this respect, with some variations, to the Constitution of the United States.

This sentiment culminated in the passage of the "Tenure of Office Bill" (as it is called) by the Congress of the United States, very shortly after which this Constitution was framed and adopted in Texas in 1869. It would be a very unwarrantable presumption to conclude that the framers of this instrument did not appreciate and act upon this pervading sentiment when they have in a manner so unusual and so pointedly declared that "the executive department of the State shall consist of a chief magistrate, who shall be styled the Governor, a Lieutenant Governor, Secretary of State, Comptroller of Public Accounts, Treasurer, Commissioner of the General Land Office, Attorney-General and Superintendent of Public Instruction," and then devoted a separate section to each one, defining distinctly his position and duties in the executive department of the government.

To be required to say that this Constitution does not make for this State a divided executive department, with the several heads thereof independent of the others, and still each one in his own sphere of duty vested with a constituent portion of the supreme executive powers of the State by force of a line of decisions of this court made under a Constitution that did not do this as to the Commissioner of the General Land Office, and contrary to the decisions of the Supreme Court of the United States, wherein the Commissioner of the General Land Office, created by statute, is treated as one of the executive departments by reason of his connection with the President in the discharge of his official duties, would be, as it is respectfully submitted, to place the authority of previous precedents above the Constitution, and, in effect, to adopt a doctrine similar to that of Lord Coke as declared in *Doctor Bonham's* case, while Chief Justice

of the King's Bench, "that the common law doth control acts of parliament, and adjudges them void when against common right and reason." (1 Kent. Com., marg. p. 448, & co. 118).

With the evils of such a system of divided executive department we have nothing to do as a court. Some of them were alluded to long since in a decision of this court delivered by me. (The State v. The Southern Pacific Railroad Company, 24 Texas.) Bishop, whose philosophic explorations into and expositions of the science of the law has placed the bench and bar under many obligations, has suggested some appropriate rules by which to determine the weight of authority.

" 1. Whatever may be the language of the judges, the decision, as a precedent in the strict sense binding in future causes, extends no further than the facts involved in the case as appearing in the record.

" 2. It is not binding as to any matter to which the mind of the court did not advert, even though within the record.

" 3. It is not binding as to any point not necessary to be passed upon in order to decide the cause.

" 4. As to the reasons given by the judges in passing upon the questions necessarily involved in the cause, and strictly within the record, these are in a qualified sense to be regarded as the law of the case, but they are not absolutely so." (Bishop's First Book of the Law, 394.)

These rules may deserve consideration in reference to what follows, without being repeated, as well as to that which has already been exhibited in this opinion.

Under the state of the law and of the constitutions, and the material change of the Constitution in reference to the Commissioner's position in the executive department, as have now been brought to view, together with the former decisions of this court in relation thereto, the conclusion, it seems to me, is inevitable, that he stands

in that department as the equal of the Governor and of the other high executive officers, and independent of them in his own sphere of action; and that if the statute of this State did authorize the courts to pass upon and revise all of his official conduct, treating him as only a ministerial officer when those decisions were made, the Constitution has lifted him from that inferior station, and that now his official acts requiring judgment and discretion can no more be directed or controlled by the courts than those of the other heads of the executive department.

There are other considerations rising above the mere critical construction of words in laws and constitutions, and pertaining to the history and intrinsic nature of the thing itself, that fixes beyond the possibility of a doubt that the issuing of a patent to land is a high official function done exclusively in the exercise of the executive department of the government. In past time, when the sovereign was the owner of the vacant domain, his grant was an absolute investiture of title, as in case of William Penn and Lord Baltimore. When republican governments were formed in America, the unappropriated vacant lands belonged to the people of the States as bodies politic, and afterwards much of it to the government of the United States. Universally, at least without any known exception, such lands have been granted under provisions of the constitutions and laws devised for the purpose, through the executive head of the government, State or Federal, aided by such officers as might be associated with or placed under him in the executive department.

Again, there is such a thing in legal science, as well as in natural philosophy, as that of fixing the position and class of an object in a system by the nature, qualities, and attributes of the the thing itself. By such a process of examination there is no escape from the conclusion

that the act of issuing a patent is the exercise of an executive function. The instrument upon its face bears the indelible impress of an executive agency, acting for the body politic organized—the State. Like most executive acts, it only imports in legal effect *prima facie* right, which may be inquired into, not having the conclusive force of a law passed or a judgment rendered. It neither concludes the State nor individuals when issued under a defect of right and to the prejudice of prior vested rights. (Smith v. Power, 2 Texas, 72; Tapping on *Mand.*, 440.)

If this judgment had been rendered in favor of Wright, and the patent had issued under it, it would not have vested in Wright any higher title by virtue of the judgment than if it had issued without the *mandamus*. The State is no party to the suit, nor are other individuals who may have an interest. It is a matter simply between Wright and the Commissioner. The Commissioner does not own the land, and a judgment against him for Wright recovers nothing but a writ—a writ to force an executive officer to perform an executive act in the usual course of his official business. Tapping, speaking of the effect of such a judgment in a similar matter, says, "It neither gives a right nor concludes one; it confers no title *per se*, but merely a legal capacity to assert one," etc. (440.) If Kuechler dies or gets out of office before the writ is executed, the judgment is dead also. (United States v. Boutwell, 17 Wall., 609; Secretary of the Interior v. McGarrahan, 9 Wall., 313.)

It has more the attributes and qualities of an investigation for contempt of court than of a personal action at law to recover a private right withheld by an officer.

The issuing of a patent may be shown not to be a ministerial act by presenting as nearly as practicable what has been regarded as a ministerial act by the Supreme Court of the United States, by which the difference may be plainly seen.

It now therefore remains to be seen whether or not the laws of this State do or may impose a duty upon one of the heads of the executive department to perform any act which may be properly denominated ministerial in its character, in contradistinction to an ordinary official executive duty, and which the courts, being of another department of the government, can force him to perform against his will, through the proceeding of *mandamus* or any other process from the courts ; and if so, is it possible that the issuing of a patent by the Commissioner of the General Land Office in a case like the present one of Kuechler v. Wright can possibly be such an act.

The legal 'mind, not only in this State but in all of the States, as shown by their decisions, is directed to the decisions of the Supreme Court of the United States as the source of light on that subject, and when they are examined it is found that whatever power the courts have to draw such a distinction between the several acts of an executive officer and to compel the performance of those adjudged to be ministerial is derived from the principles of the common law as applied to our system of government through the power of the courts to issue the writ of *mandamus*.

It is proposed now to see if in importing the common law across the Atlantic this high prerogative writ of the king or queen of England—"one of the flowers of the crown "—has, in the distribution of the powers of government, been placed by the framers of our constitutions in the judicial department in its full proportions and vigor as it existed at common law in the Court of King's Bench in England. For we have not adopted the English statutes regulating it as a remedy somewhat analogous to an ordinary action at law requiring a judgment and allowing a writ of error, all of which did not exist at common law any more than in a proceeding for contempt of court. (Tapping, 472 to 490; 1 Chitty's General Practice, 791.)

The powers of government in England have been distributed by immemorial custom and precedent, mutual adjustment and adaptation, without any written Constitution defining the distribution. For the present purpose it is sufficient to say that parliament enacts the laws and the king executes them through the agencies from time to time used for that purpose. The power of the king to execute is commensurate with the power of parliament to enact laws. There is no limitation in the extent of the power to execute, but only in means to be used, which have by degrees fallen into particular agencies and regulated forms. In early times much of this was done directly by orders of the king and his council, some of which are still extant, signed "*p ipm Regem t cons.*" But he used this means of suspending laws as well as of executing them, and as it grew into disfavor the cabinet or ministers of State, the courts of Chancery and of King's Bench, enlarge their powers so as to accomplish the same objects in a manner better regulated and with more justice to the subject. Through these three channels the executive power of the government was exercised, except so far as it was entrusted to inferior tribunals, all of whom were in some way under the control and direction of these three high agencies. The Court of King's Bench, where the king was supposed to preside, as doubtless he did in early times, was not limited to the exercise of merely judicial functions, but by the use of the writ of *mandamus* (which is the language of royalty itself) could cause " any person, corporation, or court of judicature" to perform any duty required of them by law. It is said to be founded on *Magna Charta*, wherein the king had pledged himself that there should be no failure or refusal of justice and right. It was used as " a suppletory means of substantial justice in every case where there is no specific legal remedy for a legal right." (Tapping, 62.) That is, it filled

up the vacuum wherever there was a deficiency in the execution of the laws on account of a right not coming under the regular forms of procedure in some of the courts of law or equity. There could be no need of issuing the writ to the ministers of State, or to those officers under their direct control and direction, and it was not done because the king could have the laws executed in those executive departments through another channel than a resort to the King's Bench and avoid the necessary confusion consequent upon such an attempt. It does not lie against the king because disobedience must be enforced by attachment. "Neither will it lie to command the officers of the crown as such (Tapping, 161), nor against Lords of the Treasury (Id., 315), nor Commissioners of Customs (Id., 164), nor against superior courts. (Id., 161.)

"A peremptory *mandamus* is not a judicial writ founded on a record, but a mandatory writ which the court of B. R. issues when it is satisfied of the prosecutor's right." (Tapping, 437.) In its exercise there the question of whether or not the act is ministerial is not always the test of the grant of it. "Thus the court will not grant the writ where a matter is left to the discretion of an individual or body of men, which discretion has been exercised, and no ground appears that it has been done wrongfully." "Where a discretion is given, by it is understood a sound discretion, for the Court of B. R. has power to and will redress things otherwise done." It must be a public duty, the performance of which is enforced, for where it is private other remedies are adequate. (Id., 64-5.)

It was not for the want of power that the writ was not issued in many cases where it was refused, being discretionary and not a writ of right, because of a respect for other tribunals, or because it would produce conflict and confusion in the execution of the law. Still it is evident

that the power was and still is exercised over a great many subjects that might not readily be considered strictly judicial, and it was exercised by virtue of the guardianship and control of the crown over all public institutions, tribunals, officers, corporate bodies, and corporations within the kingdom, as a royal prerogative never yet surrendered. What would be thought in this country of a writ of *mandamus* issued by the District Court to compel a railroad company to proceed in making its road, or to the trustees of a graveyard to admit a citizen to be buried in a public burial ground, or of the judge of the Travis County District Court taking a personal view of a steam planing shop in the city of Austin, and upon his own disgust at the noise, smoke, and handling of plank on the sidewalk, should issue a writ of *mandamus* to abate or suppress it as a public nuisance? Yet such are the extraordinary powers that the Court of King's Bench can and does exercise by authority of the common law in England. (Tapping, 293, 108, 220.)

The matters to which special attention is invited are, that this great power of the Court of King's Bench was largely executive in its character, and, as claimed with apparent pride by some of the judges, was exercised by that court in virtue of the king's prerogative to execute the laws in cases not falling within their judicial functions, and yet they did not issue the writ to the king's ministers, or to their subordinate officers. The powers of government were not divided as here into three distinct bodies of magistracy, but as to the persons exercising power there was a peculiar admixture in the exercise of their powers. The fact that the House of Peers constituted the High Court of Appeals, and not the king himself, tended to establish an independent judiciary, as far as practicable, consistent with its appointment by the crown, which, having been long fostered by the greatest talents of the country, suggested the idea which was

incorporated in American constitutions in the creation of a separate and independent department styled the judicial department, to be co-ordinate with the legislative and executive departments. In doing so, the question may now be asked, to which department was this extra-judicial portion of this high prerogative power of the Court of King's Bench confided? Although there seems not to have been any express separation and reappropriation of that power as exercised by the Court of King's Bench, the failure to do which has continually produced and still produces perplexity and uncertainty in adjudications in relation to them, still it is surely safe to say that that portion of the power of the crown which was entirely executive in its character, that was exercised by his ministers of State, was given certainly and exclusively to the chief executive and to such officers as might be associated with him in the executive department of the government. If this be correct, the conclusion would inevitably follow that our courts, to whom have been confided only judicial powers, cannot compel the heads of the executive department to perform any of their executive functions.

The practice of the government of the United States for over three-fourths of a century is the highest authority that could be adduced in favor of that position. During all that time the President, made by the Constitution the chief executive of the government, has controlled the heads of the executive department provided for his aid by laws of Congress, in the exercise of their official functions in the execution of the laws, even to the extent of removing some of them to carry out his construction of law. His judgment and discretion has been the finality—the final determination of last resort in reference to the rights of individuals arising in and pertaining to that department without the interference or aid of the courts in ordering and directing as to the manner in which they should be disposed of by any of the heads

of the executive department, with one solitary exception, if that can be regarded an exception, which was in the *mandamus* case of Kendall v. The United States. (12 Peters, 524.)

In that case as well as in the case of Marbury v. Madison, where the writ did not issue only for want of jurisdiction, such interference and control by the courts of the official functions of the heads of the executive department in the exercise of the powers confided to them by the constitution and laws was expressly and most earnestly disclaimed. Chief Justice Marshall says : "With respect to the officer to whom it would be directed, *   * it is not wonderful that in such a case as this the assertion by an individual of his legal claims in a court of justice, to which claims it is the duty of that court to attend, should at first view be considered by some as an attempt to intrude into the cabinet and to intermeddle with the prerogatives of the executive. It is scarcely necessary for the court to disclaim all pretensions to such a jurisdiction. An extravagance so absurd and excessive could not have been entertained for a moment." (Marbury v. Madison, 1 Cranch, 279.) Again in the same case it is said : "By the Constitution of the United States the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character and to his own conscience. To aid him in the performance of these duties he is authorized to appoint certain officers, who act by his authority and in conformity with his orders. In such cases their acts are his acts, and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion." Speaking of the Secretary of State, he says in this connection : "This officer by that act (meaning act of Congress) is to conform exactly to the will of the

President.   He is the mere organ by which that will is
·communicated.   The acts of such an officer, *as an officer*,
can never be examinable by courts."   (Id., 277.)   The
opinion proceeds to argue that the commission had been
·completed by signing and sealing, after which no further
official act was necessary ; the right was vested, the paper
was the evidence of his right, the delivery of it was a
personal act.   To enforce that act the writ would lie.
But how does the learned Chief Justice show that the
Secretary of State was a person to whom the writ could
·be directed ?   He could not do that from the common law
·of England, upon which the general right to the writ as a
·remedy was based.   No precedent in England or America
was cited for it, nor, as is it believed, could it have been
·cited.

He informs us himself as to this, which may here be
·seen.   He says :   "The act to establish the judicial courts
·of the United States authorizes the Supreme Court of the
United States to issue the writs of *mandamus* in cases
warranted by the principles and usages of law to any
courts appointed, or persons holding office under the
·authority of the United States.   *   *   *   The Secretary
·of State being a person holding an office under the author-
ity of the United States, is precisely within the letter of
·the description," etc.   (Id., 281.)

The only point really decided in that case was that
that very law was unconstitutional on account of its at-
tempt to confer original jurisdiction on the Supreme
·Court.

The case of Kendall v. United States came up on ap-
peal about thirty-five years afterwards, and in its decision
this matter of basing the right to issue the writ on this
·unconstitutional statute does not seem to have been no-
·ticed at all.

In the case of  Kendall v. United States, where the
·writ was issued to compel an allowance of a " credit,"

the court say :    " We do not think the proceedings in
this case interfere in any respect whatever with the rights
or duties of the executive, or that it involves any conflict
of powers between the executive and judicial departments
of the government.   The *mandamus* does not seek to
direct or control the Postmaster-General in the discharge
of any official duty partaking in any respect of an exe-
cutive character, but to enforce the performance of a min-
isterial act, which neither he nor the President had any
authority to deny or control."   But suppose that the
President had assumed the authority to *order* the Post-
master-General not to enter the " credit," and the court
had *ordered* (*mandamus*) him to enter the "credit,"
which ought he to have obeyed, the President or the
court?   It is unfortunate that such a question is not
directly presented and solved in the opinions in either of
the two cases.   President Van Buren, though applied to
in that case, would not "commit" himself by ordering
the Postmaster-General to give the credit or not to give
it, and therefore the issue was not made, and that ques-
tion remains still undecided up to the present day by any
direct decision of the Supreme Court of the United States.
The first opinion (in Marbury v. Madison) does not name
the act to be enforced by the court, but says it is not an
executive act.   The second opinion (in Kendall v. United
States) styles the act to be enforced by the court a minis-
terial act.   A case where the question is again fully dis-
cussed (United States v. Guthrie, 17 Howard) in the opin-
ion, the acts that can be enforced are described to be
"acts rather extraneous, and required rather of the indi-
vidual than of the functionary."   In the late case of
United States v. Boutwell, 17 Wallace, 609, it is held to
be an act so attaching to the person, and not to the office,
that upon the resignation of the officer against whom the
writ issued the suit abates and is dismissed.   See also
Secretary of the Interior v. McGarrahan, 9 Wallace, 313 ;

Reese v. City of Waterton (not reported), October Term, 1873.

The origin and source of this distinction as to ministerial acts and other acts of an executive official character, as specially applied to the heads of the executive department and derivable from the principles of the common law, have been sought for in vain.

It may, however, be deduced from these cases in the Supreme Court of the United States that an executive official act of one of the heads of the executive department is an act performed by him in the exercise of the executive powers of the government confided to him by the Constitution and laws.

What is called a ministerial act of one of such officers, in contradistinction to an executive official act, is a personal act devolved by law on him as an individual and not as an officer, by reason of his being the person who happens to hold that office at the time the act is required of him.

It is said in those leading decisions that this ministerial act is one which the President has no authority to forbid to be done, and which the law imposes directly upon the officer and which makes him "*the officer of the law.*" (Marbury v. Madison, 1 Cranch, 277.) The act, according to this, is an act of an executive officer, which is still not an executive act, but is an act of an executive officer—that is, an act of an officer of the law.

"An officer of the law" is a designation unknown to our Constitution. In a large sense all of our officers are officers of the law, and are bound to obey it. But that does not in the least degree indicate who it is, or what tribunal it is, that is to *bind* them, to *order* them, to *coerce* them to *obey the laws*. That at last depends necessarily upon what department of the government they belong to in our constitutional division of the powers of government.

Authorities from other States have not been cited or discussed, because they are conflicting, and their decisions have often been made with divided courts like those in the Supreme Court of the United States; further, because they are all streams from the same fountain, to-wit, the decisions of the Supreme Court of the United States.

Now it would seem to be very obvious that this act that is denominated a *ministerial* act, which has called into requisition all the powers of speech of the most learned jurists of the last half century to convey a remotely definite idea of it, whatever may be its character, bears not the least resemblance to the executive functions of the Commissioner of the General Land office, necessarily performed by him in such a case as the one now before us, involving at every step questions of law and of fact necessary to the performance of the final act on his part in issuing the patent. I have not stopped to notice his association with the Governor in the performance of this act, which seems to be an additional ground of objection according to the authorities cited in similar cases in the Supreme Court of the United States.

As to what should be our determination should a case arise where the act required to be done bore any reasonable analogy to what is called a ministerial act, then it will require a serious consideration of how far the weight of authority will control the rigid principle depending upon the constitutional division of the powers of our State government.

If this writ is to be used as a remedy for the assertion of private rights in this State, as to the heads of the executive department, it should be regulated by provisions in the Constitution, and also by statutes, as it is in England.

I have no hesitation in giving it as my own opinion now that the court should on such issue be governed by and follow the logical deduction to be plainly drawn

44

from the division of the powers of government between the distinct departments in the Constitution of the State.

Each department should be made to rely upon its own wisdom and judgment in the exercise of all the powers confided to it by the Constitution, independent of the control of the others, pending the performance of its official functions, and should be solely responsible for its own action, and that thereby the final separate independent action of each would operate as a check upon the excess of power that might be assumed by the others.

The judicial department is not that power to which has been confided the high trust, by any such interference in the official conduct of the others, to regulate the harmonious action in the machinery of our State government.

Such regulating power is only found, and in a republican government should only be found, in the direct representatives of the people of Texas — in the Senate and House of Representatives of the Legislature, by the action of two-thirds of whom, through the power of "address and impeachment," the Governor and other heads of the executive department, and the judges of the courts and other officers, may be removed whenever their conduct may make it necessary, in order to prevent jarring conflicts, and to secure a good government for the protection of the rights and liberties of the people of the State.

The authority for the exercise of this power, assumed by the courts to control the conduct of the heads of the executive department, in the isolated and exceptional instance of what is called a ministerial act, however it may have since been extended in many of the States, from a difference of opinion as to what constitutes such an act, is founded on and traceable to the *dictum* contained in the opinion of the Supreme Court of the United States in 1803, in the case of Marbury v. Madison. It was delivered by Chief Justice Marshall, who is universally regarded, it is believed, as the greatest lawyer America

has produced. And that was emphatically a *lawyer's* opinion.

Why, it may be asked, should the courts continue to follow in the train of a line of decisions that originated in a useless *dictum* that seeks to make such an infinitesimal exception to a broad general rule, and thereby break down a general principle by a breach that opens the door of intrusion and gives to the intruder the right to determine the extent of his power to intrude through the breach he has himself assumed to make; making an exception the exact limits and boundaries of which the ablest jurists have never been able to convey a definite idea with anything like consistency and uniformity, which is liable at any time to produce internal conflict and confusion, and which has almost continually been adopted with dissent and dissatisfaction?

The circumstances and remarkable juncture of public affairs under which that *dictum* appeared in the opinion thrust themselves into the estimate of its weight as authority, as no practicable purpose can be found in the opinion itself for so labored an argument to prove what was not necessary to decide the case. As to all that part of the opinion not relating to the appellate jurisdiction of the court (which was the real matter in issue), it is a most ingenious argument, made gratuitously in a judicial decision under the sanction of the highest judicial tribunal of the country, thereby attempting to give to it the sancity of the judicial ermine—unassailable from habitual and traditional respect—to stand in a high place as a perpetual memorial of the assumed outrageous abuse of official authority in the alleged deprivation of a private right of a citizen by the executive department of the government of the United States, then in power.

Mr. Madison, then Secretary of State under President Jefferson, who stood pre-eminent amongst the great men who framed the Constitution, and who may be supposed to

have understood its meaning, and to have desired its preservation equally with any one else, treated this effort on the part of the court to interfere with his official conduct with—silence (not to use a stronger term), in not answering to it. Still he was not attached for contempt for not making a return to the writ or otherwise making an answer in court; but instead of that, as it appears from the report of the case, some of the clerks of the secretary's office were picked up and brought into the court, from whom, it may be presumed, the facts were established upon which the argument in that part of the opinion was founded. It was surely not necessary to ascertain any fact whatever except the application itself of the relator, Marbury, to ascertain that it was an original suit and not an appeal, upon which fact alone the decision of the case was based and judgment rendered. And I borrow from him the reason why such an opinion so delivered should not be followed as a precedent, which is contained in the same opinion; that this is, or at least should be made to be, what he says it has been termed, "*a government of laws and not of men;*" and I will presume to add that it is high time that the judicial idolatry for a name, however great and deserving, by which a *dictum* of any court has been made the law of the land should begin to cease in this country.

I will close this opinion in the words of Sir William Blackstone, equally eminent for his great learning and for his profound knowledge of the science of law and of government, as fully expressing my own mature convictions as applicable to this and to all such cases, which is that "*nothing is more to be avoided in a free constitution than uniting the provinces of a judge and a minister of State.*"

GOULD, ASSOCIATE JUSTICE.—I concur in the refusal of the motion for rehearing.

The decision and the opinion of the majority of the court in the case of Bledsoe v. The International Railroad Company, which have been discussed in the opinions in this case, received my deliberate assent.

I concur also with the Chief Justice in the general views expressed in his opinion in this case as to the writ of *mandamus* to those high executive officers recognized by the Constitution as composing the executive department. In the view of the Constitution (that of 1845 as well as the present) the temporary deprivation of an individual right without an adequate remedy is a less evil than the control of any one of the three departments of the government by another.

But former decisions of this court, both prior to and under the present Constitution, have recognized the authority of the courts to enforce the issuance of a patent by the Commissioner of the General Land Office through the writ of *mandamus*. I deem it unnecessary in this case to express my individual opinion as to whether these cases should be overruled or not.